# Kenderdine Hydro-Carbon Fuel Company v. Fayette R. Plumb, Appellant.

*Contract—Agreement to manufacture patented article—Abandonment of contract.*

Where a person enters into an agreement with the owner of a patented article to manufacture it for the market, and no time is fixed for the duration of the contract, the person agreeing to manufacture the article, if he desires to withdraw from the contract, must give a reasonable notice to the other party of his intention to do so; and whether such notice has been given or not is a question of fact for the jury.

In an action of assumpsit to recover damages for a breach of contract, it appeared that defendant agreed to manufacture a patented article owned by plaintiff, a corporation, and to expend at least $9,000 in manufacturing it. As compensation he was to receive two fifths of the corporate stock; be made treasurer of the company, and pay himself out of any profits remaining in his hands after paying other creditors. No time was fixed for the duration of the contract. The defendant manufactured the article for seven months, and expended thereon $3,000 in excess of the gross receipts from the sale of the article. He then offered to withdraw from the contract, losing the money which he had expended, and to go wholly out of the company and its business. This offer was not accepted, and soon afterwards defendant stopped manufacturing the article, and discharged from his employment the men whom he had employed in accordance with a provision of the original agreement. The evidence for the defendant tended to show that the manufacture and sale of the article could not be

made a commercial success. *Held,* (1) that if plaintiff was entitled to recover at all, it could recover only nominal damages, unless it could show that profits were, or ought to have been, made out of the business, and then only to the extent of what should have been received by it after the payment of advances and expenses; (2) that it was error to charge that the measure of damages was the unexpended balance of the $9,000.

Argued March 29, 1897. Appeal, No. 20, Jan. T., 1897, by defendant, from judgment of C. P. No. 1, Phila. Co., Sept. T., 1894, No. 375, on verdict for plaintiff. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM and FELL, JJ. Reversed.

Assumpsit for breach of contract. Before BIDDLE, J.

At the trial it appeared that the contract sued upon was as follows :

Memorandum of agreement, made this 6th day of July, A. D. 1892, by and between the Kenderdine Hydro-Carbon Fuel Company, a corporation created by and existing under the laws of the state of West Virginia, of the first part, and Fayette R. Plumb, of the city of Philadelphia, of the other part. Whereas, the party of the first part is the owner of patent No. 465,668, dated December 22, 1891, granted to William J. Kenderdine, for improvements in vaporizers of hydro-carbon or similar fluids, as well as certain improvements since made by the said William J. Kenderdine, for which patents are about to be applied for : And whereas, the said party of the first part has started the business of manufacturing and selling the said invention at some of the well known factories in this country, and is desirous of extending the said business : Whereas, the party of the second part is desirous of becoming interested in the said company and business of said company.

Now this agreement witnesseth, that the said party of the second part, in consideration of the provisions of this agreement, covenants, promises and agrees as follows : (1) That he will act as treasurer and manager of the said Kenderdine Hydro-Carbon Fuel Company, and that he will use his best endeavor to promote and extend the interests of the said company ; (2) that he will manufacture the inventions and improvements aforesaid at his own works at the cost price, covering wages, material, rent of power and machinery. It is understood, however, that the sum total of such charges shall not be in excess

of the present cost of manufacturing a similar number of said burners by the party of the first part, statement of which is hereunto annexed; (3) that he will employ the necessary number of salesmen to sell, canvass and advertise the inventions and improvements aforesaid, and furnish all advertising matter, printed or otherwise, necessary for the proper conduct of the said business, and shall furnish all funds necessary to pay for the same, provided the sum shall not exceed, including the amount mentioned in clause 4, $10,000; (4) that he will pay any existing debts of the said Kenderdine Hydro-Carbon Company not exceeding the total of $1,000.

Party of the second part agrees to keep accurate accounts of all receipts and expenditures and business done, in the regular books of the company, which shall at all times be open to the inspection of any of the directors, and he further promises to do all in his power to build up a substantial and profitable business for the party of the first part.

It is agreed that William J. Kenderdine shall be employed at a salary of $30.00 per week, and shall give his whole time to the business, and that his son George Kenderdine shall be similarly employed at a salary of $15.00 a week, and that Edward Yerkes shall be allowed to devote at least one half of his time to selling burners and assignments and establishing agencies for their sale in different parts of the country, and that he shall be paid his traveling expenses and that proportion of his salary which the time given bears to his whole working time.

The said party of the first part, in consideration of the provisions of this agreement covenants, promises and agrees as follows: (*a*) that the said party of the second part may repay himself any amount due him under 2, 3 and 4, above written, from any profits remaining in his hands as treasurer, after the payments of any debts due by the company to other creditors, (*b*) that the party of the first part agrees to procure for and issue to the party of the second part two fifths of its entire capital stock, being two hundred shares of nonassessable stock, one hundred shares to be delivered upon the execution of this agreement, and one hundred to be delivered in six months from date of said execution, meanwhile to be delivered to E. Clinton Rhoads in escrow.

Other facts appear by the opinion of the Supreme Court.

VOL. CLXXXII—30

The court charged in part as follows:

[The amount of damages, which is specified by the plaintiff here, is asked for in this way: He says the defendant was bound to advance up to the amount of $10,000, and in consequence of his not advancing money to that amount, this venture was a failure. If you believe that the whole thing fell through in consequence of his not advancing that money, then I think the plaintiff is justified in asking for the $9,000, which the defendant did not expend; but if you believe that this was a matter in which the expenditure of money would be useless, in my opinion, you would not have any right to inflict any damages upon him at all.] [5]

Defendant's points and answers thereto were among others, as follows:

1. That a contract for continuous service is terminable at the will of either party where there is no stipulation as to the time for which it is to remain in force. *Answer:* Refused. [6]

2. The contract sued upon not specifying any time for which it was to continue, Mr. Plumb had a right to terminate it at his own pleasure. Consequently his notice that he would not continue was no breach. *Answer:* Refused. [7]

3. There is no evidence from which the jury could find that any profits could have been made under any circumstances out of the burner, and no allowance, therefore, can be made for loss of profits. *Answer:* Refused. [8]

4. No value has been shown for the stock of the company, and no allowance can be made for such stock. *Answer:* Refused. [9]

5. The defendant tenders a return of the stock which he received, and an order for the delivery of the stock held in escrow. *Answer:* This is an answer to the demand for an allowance by way of damage on account of said stock. [10]

8. The advances made by Plumb became a liability of the company and the company was bound to repay them. The stipulation that Plumb might repay himself out of profits, does not mean that the company was not bound to pay back such advances if there were no profits. *Answer:* Refused. [11]

9. That when Mr. Plumb refused to proceed further under the contract, the Kenderdine Company had a right to employ others to make and sell the burners and hold Plumb for any loss up to that time. *Answer:* Refused. [12]

10. It is a rule of law that a party injured by breach of contract is bound to take all reasonable means to make the loss as small as possible, and the Kenderdine Company were bound, if the patents were valuable, to avail themselves of that value. They could not sit down and do nothing with a view to holding Plumb for loss which they could have avoided. *Answer:* Refused. [13]

Verdict and judgment for defendant for $6,000. Plaintiff appealed.

*Errors assigned* among others were (5–13) above instructions, quoting them.

*Richard P. White,* with him *John Roberts,* for appellant.—The amount of the consideration is not the measure of recovery: 2 Sedgwick on Damages (8th ed.), 255; Price v. Guardian Mut. Life Ins. Co., 5 W. N. C. 250.

In an action for breach of warranty, the measure of damages is the difference between the value of the article as warranted and its real value as delivered. The contract price does not enter into the question as a rule of measurement of damages: Cothers v. Keever, 4 Pa. 168; Seigworth v. Leffel, 76 Pa. 476; Nixon v. Myers, 141 Pa. 477; Rhey v. Ebensburg & Susquehanna Plank-Road Co., 27 Pa. 261; Bell v. Walker, 5 Jones, 43; Fessler v. Love, 48 Pa. 409; Lentz v. Choteau, 42 Pa. 435; New York v. Ransom, 23 Howard, 488; 1 Sedgwick on Damages, (8th ed.) 245; Hutchinson v. Snider, 137 Pa. 1; Adams Express Co. v. Egbert, 36 Pa. 360.

This contract could not be intended as perpetual, and no time being fixed for its termination, necessarily it was terminable at will, and there was no breach: Coffin v. Landis, 46 Pa. 426.

*A. T. Freedley,* for appellee.—A defendant cannot rescind his contract and decline to further comply therewith, and at the same time retain the benefits he has received in consideration of performance thereof: Jones v. Brown, 167 Pa. 398; Guilinger v. Zahniser, 5 Cent. Rep. 303; Davis v. Reyner, 12 Montg. County Law Rep. 52; Miner v. Bradley, 22 Pickering, 457; Emmet v. Reed, 8 N. Y. 312.

Profits as such can only be recovered when the contract

directly stipulates therefor, or when by the contract it appears that they are clearly to have been in the intention of the parties at the time the contract was made: Pennypacker v. Jones, 106 Pa. 242.

The injured party is to be placed as nearly as may be in the situation he would have occupied if the wrong had not been committed: McDowell's App., 123 Pa. 381; Wicker v. Hoppock, 6 Wallace, 99.

OPINION BY MR. JUSTICE WILLIAMS, Oct. 11, 1897:

The plaintiff company, prior to the making of the contract now sued on, had an authorized capital of $50,000, divided into five hundred shares of $100 each. This was owned by three men, Kenderdine, Kitson and Weidershime. The first contributed the patent for the burners which constituted the property of the company. The second contributed services of some sort. The third contributed more services. Neither paid a farthing in money, but together they held the entire stock as fully paid, and subject to no further assessment. The only asset of any value belonging to the company was the mere right to make and sell burners. To test the value of this asset it was necessary to find some one who would furnish the money needed for this purpose, and place the manufactured burner upon the market. Plumb, the defendant, undertook to do this. On the 6th of July, 1892, he entered into a contract with the plaintiff company, by the terms of which he was to act as treasurer and manager of the company; pay its debts not exceeding $1,000 contracted in the attempt to manufacture some of its burners; manufacture Kenderdine burners for the company at his place of business, and furnish them to it at the actual cost of manufacture; and provide the money needed for purposes of manufacture, and the employment of salesmen to advertise and sell their burners, not to exceed $10,000, inclusive of the debts of the company he had undertaken to pay. He agreed also to employ Kenderdine at $30.00 per week, his son George at $15.00 per week, and his brother-in-law Yerkes as a salesman for not less than one half his time, paying all his traveling expenses and a suitable salary therefor. In consideration of all this he was to receive two hundred shares of the paid up stock, and the prospective dividends they could be made to yield from the profits realized by

sales of the burners. Under the terms of this contract Plumb began the manufacture of burners, and the effort to put them on the market and sell them to consumers. After a few months' experiment in the business he complained to the gentlemen who composed the company that he had been deceived by them in the negotiations that led up to the contract, as to the utility and comparative value of the burners. He alleged that he had become satisfied that the patent had no real value, and that burners could not be sold in such numbers as to make the business of manufacture and sale profitable to the company or himself. He told them he had expended about $3,000 in excess of his gross receipts already, that he was ready to lose this sum, return the stock that had been transferred to him, resign his office as treasurer and manager, and go wholly out of the company and its business. This offer was not accepted. Not long thereafter Plumb discontinued the manufacture of the burners, and the employment of Kenderdine, his son, and his brother-in-law; and the company brought this action to recover damages alleged to have been suffered by reason of Plumb's refusal to continue the manufacture of burners under the terms of the contract of the 6th of July, 1892. Three questions were thus raised. Had Plumb the right to retire from the contract at his pleasure? If not, did his breach of its terms inflict damage on the company plaintiff?' The second question involves an inquiry into the commercial value of the " Kenderdine burner." Third, if the plaintiff is entitled to recover, what is the measure of its damage? The terms of the written contract were indefinite as to its duration. No time was fixed at which the relation between the parties should cease. If either party desired to terminate it, if this could not be done by agreement, it was his duty to deal fairly by the other party and give a reasonable notice of his intention to withdraw from it at a fixed time. He could not abandon the joint undertaking arbitrarily, and at his own will, without an injustice to the other party, and incurring liability for at least nominal damages for the breach of his contract. Whether Plumb gave such reasonable notice of his intentions to terminate the contract relation between the plaintiff and himself was a question of fact for the jury. If they found against him on this question, then it became necessary to advance to the next inquiry, viz: did his breach of the contract

inflict any substantial injury on the plaintiff? This must depend on the value of the contract to the company. If the Kenderdine burner was a useful invention, having some commercial value, and able to compete successfully with the burners of other makers, in the markets, then the contract had some value to the company that owned it, and the breach of the contract providing for its manufacture and sale inflicted an injury on the company corresponding to its three fifths of the net profits to be made upon the sales. On the other hand if the invention had no commercial value, and could not be sold in the markets in sufficient quantities to make the business of its manufacture and sale a profitable one, then the contract had no actual value to the company, and its breach inflicted no substantial injury upon it; Kenderdine and his relatives lost employment temporarily, but the company lost nothing. It had no interest in the wages of its employees or those of Plumb, but if the business was not profitable it was interested in reducing wages and diminishing expenses. The income of the company was to be derived exclusively from net profits, and, if net profits were not made out of the business, the longer the work of manufacturing the burners was continued the greater would be the loss suffered by it.

Whether the plaintiff, if entitled to recover, should be allowed more than nominal damages must depend on whether the manufacture and sale of the burners was, or could reasonably be made to be, a profitable business to carry on. If the jury could, on the evidence before them, find that the business would pay a net profit, then the answer to the third question is very plain. The measure of the plaintiff's damages would be the probable profits over all expenses that would fall to it from the sale of the burners, after the reimbursement of the defendant for his advances. He had undertaken to make advances, for the purpose of testing the value of the business, up to $9,000, in addition to the payment of $1,000 indebtedness of the company. But he was to repay himself these advances out of the sales before any division of profits could be made. The contract proceeded upon the assumption that profits would be made, and to an extent sufficient to repay Plumb all advances made in developing the business before the company or its stockholders could receive anything. Did the experiment justify this as-

sumption? The business was prosecuted by the defendant for about seven months in apparent good faith. He employed the inventor and his son in the manufacturing of the burners, and Yerkes, the brother-in-law, in the sale of them. He advanced about $3,000 above the income of the business in carrying it on; and became thoroughly satisfied, as he says, that the business could never be made to pay a profit, but that to increase his advances further was simply to increase his losses. It was at this time that he offered to return his stock, resign his connection with the company, and lose his advances. This would have left the company an opportunity to make some other arrangements for the manufacture and sale of the burners that would have produced a profit, if a profit could be obtained from the business, but this offer was declined. The company insisted that Plumb should continue to make advances up to the sum of $9,000 named in the contract whether they could be repaid or not. Worse than this, it claimed to recover as its damages the $9,000 or the unexpended balance of it, which Plumb might have lost, but not one cent of which could have gone to the company if he had continued the business. The learned judge of the court below instructed the jury that this was a proper measure of the plaintiff's damages. This was error. This $9,000 was the sum estimated to be necessary to determine whether the business could be made to pay a profit. It was to be expended in wages and materials necessary to make burners and to put them on the market in a businesslike way. If it had been actually advanced and expended and the business had continued unprofitable, not only could no part of the $9,000 have reached the company, but no profit would have been made, and the result would have been to increase the defendant's losses from $3,000 to $9,000, for which he would have had no recourse, except against the corporation plaintiff that was without assets, other than the patent upon its burner. The advances were the measure of the defendant's possible loss, but under no conceivable circumstances could they become the measure of the plaintiff's damages. The plaintiff's loss was a loss of three fifths of the profits made out of the business, after reimbursing the advances. For seven months, and after $3,000 spent in advances, no profit was made, but the business was found to be behind by the entire amount of the money advanced. The burner did

not sell as it was expected. Purchasers returned many of them, as less economical and satisfactory than other burners on the market. They were found, as it was alleged, to require more oil than was represented by the owners of the patent, and the margin between the actual cost of manufacture and the selling price was consumed in expenses and charges. To Plumb it seemed clear that the experiment had been tried sufficiently to determine that the business was a commercial failure, and that he would not be able to reimburse himself, to say nothing of making net profits for division. If he was right, the plaintiff had suffered no substantial loss, and was entitled at most to nominal damages. If he was wrong, the plaintiff was entitled to no more than its three fifths of what might be earned after fully reimbursing the defendant for his advances. Up to the time the business was discontinued it seems reasonably clear from the testimony that no profits were made and that the expenses exceeded the income by at least $3,000. Up to that time therefore it is not easy to see how anything more than nominal damages could have been suffered by the plaintiff, or incurred by the defendant. The question raised by the eighth assignment does not appear to have been regarded as of sufficient practical importance to receive a distinct ruling; but if this case should be tried again, and the evidence be such as to justify the submission of the point once more to the trial judge, it should be affirmed. The plaintiff can recover only nominal damages unless he can show that profits were, or ought to have been, made out of the business, and then only to the extent of what should have been received by it after the payment of advances and expenses. Although the assignments of error have not been considered seriatim, yet what has been said substantially covers the important questions raised upon this record.

The judgment is reversed and a writ of venire facias de novo is awarded.