Commonwealth Trust Company of Pittsburgh *v.* Hachmeister Lind Company et al., Appellants.

234

Argued October 16, 1935. Before FRAZER, C. J., KEP-
HART, SCHAFFER, MAXEY, DREW, LINN and BARNES, JJ.

*William B. Paul,* with him *Edward R. Lawrence,* for
appellants.

*Albert C. Hirsch,* with him *Cresswell S. Shumaker, J.
Randall Thomas* and *Watson & Freeman,* for appellee.

OPINION BY MR. JUSTICE LINN, November 25, 1935:

The plaintiff, as trustee for Christmas, an inventor,
and for others with interests in the invention, has judg-
ment on a verdict against defendants, trustees in bank-
ruptcy for Hachmeister Lind Company, a corporation,
for royalty owing and for royalty that would have ac-
crued in the future but for the corporation's breach of
contract to manufacture and market the subject of the
invention. For convenience, Hachmeister Lind Com-
pany will be referred to in this opinion as the Company.

The verdict was $97,691.49 of which, as defendant concedes, the sum of $12,691.49 represents royalty admitted to be due with interest.[1] As that sum was admitted to be due there is nothing to support the assignment of error complaining of the refusal to enter judgment n. o. v. Deducting the admitted sum from the verdict gives the amount allowed for damages for breach of contract as $85,000.

The important complaint now made, and the only one needing special reference, is that the evidence produced by plaintiff to enable the jury to fix the damages was too uncertain and speculative for the purpose. Defendant proposed no better method for ascertaining the sum to which plaintiff was entitled by reason of the Company's breach of contract, but, in effect, took the position that the law furnished no redress in the circumstances.

December 3, 1930, G. B. Christmas made a written contract with the Company. He is described in it as "inventor of a special treatment for electrical bulbs to be used in automobile headlights, for which patent has been applied for."[2] By the contract he assigned to the Company his application for the patent "and right to manufacture and market the bulb, and [agreed] to assign the patent when granted and to extend to the [Company] all rights to improvements he may develop. . . ." The patent was granted in 1932. The Company agreed

---

[1] The case was tried twice; at the first trial, in 1934, the verdict was $110,307.45, of which amount the jury found specially that $100,000 represented damages for breach of contract generally, and $10,307.45 represented royalty due with interest to the date of that trial. The trial court granted defendant's motion for a new trial.

[2] In a statement made by the Company to the Pittsburgh Stock Exchange, February 25, 1932, the merits of the invention were thus described: "The principal features of the bulb being that it minimizes glare, increases visibility in fog, gives greater light intensity than any other light and spreads the beams to the sides of the road to a greater extent than any other light."

to pay him a royalty of ten cents per set of two bulbs of the first 50,000 sets sold in each year and five cents per set on the excess of 50,000 in each year. The contract contained the following provision: "The [Company] to provide manufacturing facilities and market the bulbs, exerting such effort and making such expenditures as they deem necessary to accomplish this." It also provided that "for a period of thirty (30) days from this date the [Company] is to have the privilege of investigating the merit and possibilities for this bulb in the market, and to accomplish this [Christmas] agrees to furnish his services required mainly to employ agents to market the bulb locally, get into limited production, etc." The Company reserved the right "to cancel the arrangement under this agreement if it is found from the investigations of [the Company] during the thirty (30) day investigation period either the market for the product or the quality or practicability of the same has not been found to be as anticipated at the time this agreement was entered into." Both parties immediately began performance. Apparently no cause arose for cancellation during the 30-day period set aside for that purpose. The record shows a remarkable measure of success up to February 10, 1932. It will be observed that the agreement expressed no definite period during which the Company should enjoy its benefits (once the 30-day period had passed) save as implied by the term of the patent, if granted, and subject to the construction of the provision, quoted above, that the Company should exert "such effort and making such expenditures as they deem necessary to accomplish" the purposes of the agreement.

It is clear from the verdict that the Company's refusal on February 10, 1932, to continue performing the contract was not the result of action under the power granted by the provision authorizing the Company to exert "such effort and making such expenditures as they

deem necessary to accomplish this," but that the breach[3] was part of a deliberately-planned scheme entirely to repudiate the Company's obligation to plaintiff and further to injure him by marketing a rival bulb which defendant said it had perfected, and would sell; this it proposed to accomplish by means of the organization created, and the advertising done, in the performance of its contract with Christmas. The Company not only made no offer to return the invention assigned, but wrongfully retained the royalty for part of December, 1931, and for January, 1932, now conceded to be owing. The evidence, accepted by the jury, supports the conclusion that the Company acted without right and in bad faith. See Kenderdine Fuel Co. v. Plumb, 182 Pa. 463, 469, 38 A. 480. The details of this phase of the transaction are fully described in the record and need not be stated here; the fact however has some bearing on the questions arising on the proof of damages. The Company admits giving notice on February 10, 1932, that it

---

[3] Christmas testified as follows: "A. On February 10th he [the Company's president] notified me to be at his office, and I went there, and he said, 'We are not going to pay any more royalties,' and I said, 'Are you going to quit manufacturing the bulb,' and he said, 'No; we are going to continue to manufacture the bulb, but we are not going to pay any more royalties,' and I said, 'Well, aren't you going to pay the royalty for last month, January, which is due to-day'—payments were due on the 10th—and I said, 'That amounts to $8,000, over $8,000, and that is due to-day, and,' I said, 'you made plenty of money last month. You made $35,000 last month alone,' and he said, 'Well, we made $40,000, but we are not going to pay you, and,' he said, 'you are not going to get a patent. We have had legal advice on this, and I know what I am talking about, and that contract of yours is no good. I wrote it, and I know what I am talking about. It is just a scrap of paper, and I will tear it up, and,' he said, 'we have two engineers working on an entirely different light that won't be covered under your patent,' and I said, 'Well, I performed my part of the contract, and I intend to continue to perform it,' and he said, 'Well, you cannot fight us. We are a big corporation, worth two million dollars and over, and we will beat you in anything you do.' "

would not pay the royalty then due or that would accrue thereafter. When the Company declined to continue performance, plaintiff notified it that its refusal would . be treated as "a complete breach of the entire contract"; this suit for damages in the nature of anticipatory breach then followed: see McCormick v. Fidelity and Casualty Co., 307 Pa. 434, 439, 161 A. 532.

At the trial one of the difficulties interposed by defendant was that the parties could not have dealt on the theory that the invention would remain marketable during the entire period protected by the patent. The result of the trial makes it unnecessary to discuss this feature of the case.

In dealing with the challenged evidence it is necessary to keep in mind the salutary rule, applied in the review of trials on appeal, that judgments will not be reversed for harmless errors; that, though error in a technical sense may appear, it will not be ground for retrial, if an appellant was not injured by the error. Even though part of the evidence was not admissible we should not disturb the judgment if consideration of the amount of the verdict in the light of the evidence conclusively establishes that the jury heeded the instructions of the learned trial judge, in substance, to draw no inferences of damage not reasonably following from as much of the evidence as the jury might regard as certain, as distinguished from that which lay in fields of mere speculation and conjecture. The application of the rule will be obvious as we proceed.

It is settled that damages for breach of contract cannot be recovered unless the evidence affords sufficient basis for estimating them with reasonable certainty. But, as we said in Osterling v. Frick, 284 Pa. 397, 403, 404, 131 A. 250, ". . . 'Where it is proved that damage has resulted from an injurious trespass and the only uncertainty is as to the exact amount thereof such uncertainty is not ordinarily ground for refusing to allow any damage at all if the evidence furnish a basis from

which a reasonable calculation can be made. . . . In such case mathematical exactness is not required. . . . In other words, the difficulty of separating the damages resulting from independent causes will not relieve a wrongdoer from liability . . . where there is data from which the extent of the injury caused by him can be ascertained with reasonable certainty. . . . Data for an exact calculation is not necessary. . . . It has been truly said that 'substantial justice is better than exact injustice.' " Damages resulting from refusal to continue performance of contracts were allowed in Freedom Oil Works Co. v. Williams, 302 Pa. 51, 152 A. 741; Pittsburg Gauge Co. v. Ashton Valve Co., 184 Pa. 36, 39 A. 223; Macan v. Scandinavia Belting Co., 264 Pa. 384, 107 A. 750; Weinglass v. Gibson, 304 Pa. 203, 155 A. 439; Western Show Co. v. Mix, 315 Pa. 139, 173 A. 183; Trust Co. v. Shrewsbury F. & M. Co., 104 Pa. Superior Ct. 564, 158 A. 641.

In view of the manner in which the Company repudiated performance and the purpose for which it did so, the following expression from Eastman Co. v. Southern Photo Co., 273 U. S. 359, 379, has particular application to the evidence in this record: ". . . 'future profits could be shown by past experience. . . . Furthermore, a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible.' " In Story Parchment Co. v. Paterson Co., 282 U. S. 555, 563, the court said: ". . . it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrong-

doer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise . . . the risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party . . . the precise amount cannot be ascertained by a fixed rule, but must be matter of opinion and probable estimate. And the adoption of any arbitrary rule in such a case, which will relieve the wrongdoer from any part of the damages, and throw the loss upon the injured party, would be little less than legalized robbery." See also Wakeman v. N. & W. Mfg. Co., 101 N. Y. 205, 4 N. E. 264; City of Kennett v. Construction Co., 273 Mo. 279; Hoffer Oil Corp. v. Carpenter, 34 F. (2d) 589; Stern Co. v. Friedman, 229 Mich. 623; Bredemeier v. Pacific Supply Co., 64 Ore. 576; Manss-Owen Co. v. Owens, 129 Va. 183; Stanolind Oil & Gas Co. v. Kimmel, 68 F. (2d) 520.

The evidence of sales of light bulbs, processed in accordance with the invention of Christmas, beginning in December, 1930, and continuing until sales practically ceased in 1932, is undisputed. It comes from the Company's records. From the same source come the representations made to the public not only with respect to the merits of the processed bulbs, but also with respect to the quantity of such bulbs that would be sold in 1932, subsequent to the date when the Company repudiated. Including sales after the Company started manufacturing in December, 1930, and ending December 31, 1931, the total sales[4] were $795,135.97.

On January 8, 1932 (33 days before the Company's president informed Christmas that no more royalty

---

[4] For each month of 1931, the sales were as follows: January, $6,405.88; February, $5,419.50; March, $9,349.19; April, $22,-349.91; May, $43,205.44; June, $83,163.64; July, $87,489.04; August, $91,540.66; September, $77,408.94; October, $121,403.77; November, $125,100; December, $122,300; Total, $795,135.97.

would be paid) the Company issued to the Pittsburgh Stock Exchange a statement of its affairs which contained the following: "The management authorizes the prediction that the volume of Perfect-O-Lite sales will reach $200,000 per month early in 1932." "Hachmeister Lind Company is to-day the largest purchaser of headlight bulbs in the world, with an almost unlimited field for expansion."

After the repudiation, the Company, on February 25, 1932, issued another statement to the Pittsburgh Stock Exchange, inter alia, saying: "Perfect-O-Lite: This division[5] bids fair to exceed all others. . . ." ". . . National advertising was started about March 1, 1931, as a result of which Hachmeister Lind Company is to-day the largest handler of mail in the Pittsburgh area." Defendant's pleadings admit that, shortly before the breach of contract in February, the president of the Company in a radio broadcast said that during the past year more than 1,000,000 sets of Perfect-O-Lite bulbs had been sold and that the Company "expected to sell one million sets of bulbs in the following ninety days." In December, 1931, 91,127 sets of lights were sold, and in January, 1932, the sales were 108,376 sets; in February, when they repudiated, only 60,439 sets were sold. At about the same time the Company purchased 1,000,000 boxes for packing them. Because of their bearing on the basis for estimating damages, these matters are recited here as part of the record made by the Company from the date it began performance until it suddenly ceased.

There can be no doubt plaintiff sustained damage. In estimating the amount of the damage, the witnesses relied largely on the Company's records. The inquiry was: What inference could reasonably be made for the future? Elements in dealing with the future, such as pos-

---

[5] The Company was engaged in manufacturing and selling a number of products besides the automobile light bulbs.

sible competition and improvement in the art which might reduce sales, were also considered. Notwithstanding the Company's records, defendant offered evidence that the invention had no merit and no value. Expert witnesses for plaintiff attempted from the Company's records and other considerations to construct a curve or graph to show what the probable annual sales would be during the life of the patent. They gave evidence of their conclusions. Witnesses for defendant denied the validity of the conclusions suggested by plaintiff's witnesses and gave their views as to possible damage, generally concluding that there was none. As to the term of the patent, it must be said that unless the Company, with plaintiff's consent, chose to surrender its rights under the agreement before the expiration of that term, the Company had the right to avail itself during the entire period of the benefits granted. This right it chose to retain. It may therefore not complain, assuming the proof otherwise sufficient to support the verdict, that the witnesses were permitted to testify to damage accruing during that period.

Was the proof sufficient within the rule applied in the cases cited above? Appellant says "it is too speculative and uncertain to be the proper basis for damages." On this record we need not attempt to fix the date beyond which it might be said that the opinions of the witnesses rested on mere guess, as appellant suggests, because we are satisfied that the jury did not base its verdict on evidence which might be considered too uncertain, but that, on the contrary, the jury rejected that portion of the evidence. The defendant cannot complain, if the record for the period during which it sold the lights was used as the basis to determine what the royalty might have been during, say, the period up to the trial. The jury was certainly justified in accepting as probable defendant's statements that, in the three months of the spring of 1932, 1,000,000 sets of the bulbs would be sold; that alone would give plaintiff a royalty of $52,500. The

same prediction would support the conclusion that the business, at a profitable rate, would in all probability continue for some time after 1932, and that, during the remaining part of 1932, or (for purposes of review if necessary to support the verdict), up to the time of trial, enough would be sold to earn royalties in the amount of the verdict. See, Restatement, Contracts, section 331, comment a. According to the evidence of plaintiff's expert witnesses the sales which they thought would be made would have required the payment of royalty from the time of the breach to the time of trial in a sum of approximately $200,000; this sum the jury not only declined to find, but greatly reduced. Under the charge of the court, the amount found due (which included interest) was only $85,000. It therefore clearly appears that if, as appellant contends, there was error in allowing the witnesses to estimate sales over too long a period, a point we need not pass on, appellant was not injured.

Judgment affirmed.