Helen RILEY, Executrix of the Estate of Bernard A. Riley, Deceased, and William E. Edgeworth, individually, and trading as Riley & Edgeworth, a partnership,

v.

GENERAL MILLS, INC.

Civ. A. No. 22297.

United States District Court
E. D. Pennsylvania.

. Feb. 27, 1964.

Walter B. Gibbons, William J. Toy, Philadelphia, Pa., for plaintiffs.

Dechert, Price & Rhoads, H. Francis DeLone, Philadelphia, Pa., for defendant.

WOOD, District Judge.

The subject matter of this opinion concerns the determination of damages in a breach of contract action. The defendant was found liable to the plaintiffs after trial to a jury in November 1962. Thereafter, by agreement of the parties, the damage portion of the case was heard by the Court without a jury on December 9 and 10, 1963.

Essentially, this case involves a promotional campaign intended to increase the lagging sales of a food product manufactured by General Mills. The inducement to buy constituted an insurance application enclosed between two packages of Betty Crocker Gingerbread Mix. A purchaser of the mix could then obtain a $1000 school-child accident and health insurance policy by remitting one dollar and the executed application to the Peerless Casualty Company, Keene, New Hampshire. The promotion was begun in the summer of 1955 and discontinued within a few months of its inception by General Mills.

The plaintiffs were the insurance agents for the Peerless Casualty Company. They negotiated with the defendant and its advertising agency to formulate the promotional campaign which was the subject matter of the contract.

With this brief background of the case, we now make the following findings of fact and conclusions of law:

FINDINGS OF FACT

1. The number of insurance applications which were printed and intended for distribution in this venture totaled 3,305,000.

2. Some 387,450 applications were actually distributed by the defendant before it discontinued the campaign in the autumn of 1955.

3. The plaintiffs were to receive a *guaranteed* commission of five per cent on the first million dollars of annual net premium, four per cent on the second million, and three per cent on the third million.

4. The plaintiffs were also to receive a *contingent* commission of 25 per cent of the net profit received on the first $3,000,000 of premium.

5. This contingent commission would be calculated by subtracting from 100 per cent of the premium received, the anticipated 50 per cent loss ratio, an agreed expense loading of 28 per cent and an average guaranteed commission of four per cent, leaving a profit of 18 per cent of the first $3,000,000.

6. Betty Crocker Gingerbread Mix was selected by the defendant as the product to be used in this promotion because its sales in units of merchandise represented only one tenth (1/10) of the annual sales of General Mills. (N.T. 469)

7. It was the intended purpose of this promotion to increase the sales of this product.

8. To insure the success of the program, national advertising in newspapers, on radio and television was planned to introduce the promotion to the public. (N.T.479–480)

9. None of this advertising was ever undertaken by the defendant. (N.T.501–502)

10. General Mills purchased sufficient cellophane and containers to package three million deal units of the gingerbread mix. (N.T.491)

11. This was a new and untried venture since school-child accident and health insurance in 1955 was a relatively new field. None of the parties had any experience in offering such insurance as an inducement to sell a food product.

12. The plaintiffs spent a year and a half negotiating and formulating this insurance promotion.

13. In the course of that time the plaintiffs made various plane trips to Albany, New York, to New York City on six occasions, Chicago, Illinois, Minneapolis, Minnesota, and they spent several weeks in Keene, New Hampshire to

work out the details of this program. (N.T. 635, 636, 637)

14. On these trips the plaintiffs incurred traveling expenses, hotel and meal costs in the estimated amount of $3,000. (N.T.636)

15. The plaintiffs anticipated that if this promotion had been effectively advertised and carried out as agreed there would have been a public acceptance ranging from 60 per cent to 90 per cent of the applications distributed. (Ex.P-4, p. 62)

16. This estimate was determined by the plaintiffs in evaluating the national enrollment of children in similar insurance plans with an elementary and high school population in November 1954 of 33,000,000 pupils.

17. The defendant's witnesses estimated that only one per cent of the distributed applications would have been returned or 33,050 of the total applications printed.

18. General Mills filed a counterclaim in this matter claiming damages in the sum of $70,782.00, which included $50,-000.00 in lost profits and some $20,782.00 in expenses.

19. General Mills sold its mix for about 30 cents a box in 1954 and earned a profit of about three per cent per dollar of sales. (N.T.767)

20. The plaintiffs have received no compensation whatsoever from the defendant.

21. It is the Court's determination that this promotion would have produced a public response of 25 per cent, or $826,250.00.

22. Of this $826,250.00 the plaintiffs would have received a five per cent guaranteed commission, or $41,312.50.

23. The commissions earned under plaintiffs' agency agreement for the school year September 1955 would have been fully earned and paid on January 1, 1957 and thereafter all commissions for each successive year of the program would have been earned on the following January 1 and interest herein is effective as to the commissions due upon the first year's business on January 1, 1957 and annually thereafter. (Ex.P-2)

24. The plaintiffs restrict their claim for interest on the lost commissions from February 1, 1957 to February 1, 1964 at the rate of six per cent, which amounts to $17,351.25.

## DISCUSSION

The determination of damages in this matter is extremely difficult because of the type of promotion involved. The success or failure of this venture depended upon the implementation of nationwide advertising to publicize the insurance program. General Mills did not advertise this offer except by a special message printed on the box of gingerbread mix. No accurate estimate of the return can be based upon the few packages which were distributed without the national advertising.

The defendant argues that it is impossible to fix the amount of the plaintiffs' lost guaranteed commissions because there exist at least sixteen states [1] in the United States which require that countersigning commissions be paid to resident agents, and, further, that at least four states prohibited the sale of this program altogether. It is further argued by the defendant that no credible evidence was presented whereby the Court could ascertain the amount of profits which might have accrued to the plaintiffs if this promotion had been completed. The defendant rejects the competency of the plaintiffs' actuarial expert who concluded that a 50 per cent loss ratio was the usual expense figure to anticipate in determining the premium for a policy in this field.

Finally, the defendant disputes the amount of the plaintiffs' out-of-pocket expenses because they failed to produce any records to substantiate their $3,000.-00 claim.

 The defendant's conduct was found by the jury to have occasioned

---

1. See Appendix A of defendant's memorandum of law.

this breach of contract. Its failure to perform has made any estimation of damages a highly exacting task. A defendant whose wrongful conduct has rendered difficult the ascertainment of precise damages suffered by the plaintiff will not be heard to complain that they cannot be measured with the same exactness and precision as would otherwise be possible. Com. Trust Co. of Pittsburgh v. Hachmeister Lind Co., et al., 320 Pa. 233, 239, 181 A. 787 (1935). Where there is basis in the evidence for a reasonable computation of the damages suffered from the breach of the contract, *considering the nature of the transaction*, a verdict may be based thereon, though there may be some uncertainty about it. Weinglass v. Gibson, 304 Pa. 203, 155 A. 439, 1931.

Therefore, *considering the nature of the instant transaction* which was a *unique* promotional venture we find that one reasonable source for computing the damages rests with the opinion testimony of expert witnesses. Where there is no other "reasonably safe basis" for measuring the substantial damages which the plaintiff has suffered by reason of the defendant's breach of his contract, expert testimony may be utilized for the purpose. Western Show Company, Inc. v. Mix, 315 Pa. 139, 141, 173 A. 183 (1934).

As to how many applications would ultimately have been returned with one dollar we have the plaintiffs' estimate of 60 per cent to 90 per cent of the total offered. The defendant's experts were less optimistic and expected a return of only one per cent of the 3,305,000 applications intended for distribution. If this estimate were correct, then only $33,050.00 would have been received in premium by the Peerless Casualty Company which was using this promotion to introduce its name throughout the United States. To say the least, the defendant's estimates are incredible when evaluated in the light of the intended advertising campaign in newspapers, on radio and television which was to have supported the promotion.

The whole purpose of this idea was to induce the buying public to increase their purchases of Betty Crocker Gingerbread Mix. We cannot believe that any major corporation would embark upon a promotion of this nature to increase the sales of one of its products if the inducement was expected to generate such a meagre response from the public.

This pessimistic attitude hardly seems justified, particularly in view of the defendant's large counterclaim for lost profits of $50,000.

Also, the estimate of one per cent makes little sense when balanced against the $20,000 expenses allegedly incurred by Peerless Casualty Company in formulating this project. (N.T.494)

While we feel the defendant's estimate is too small, we also believe the plaintiffs' estimate of 60 per cent to 90 per cent is too high.[2] This estimate was prepared by the plaintiffs and accepted by the defendant's advertising agency and embodied in the proposal submitted to the defendant. (Ex.P-4) The plaintiffs' estimate was predicated upon the experience of similar school-child accident programs, but none of these programs depended upon the sale of a food product (which was an admitted slow seller) to provide the outlet for purchasing the insurance.

"If it becomes the duty of the court below to award damages for breach of contract, it must be kept in mind that no more can be recovered as damages than will fully compensate the party injured. *There is no formula by which this amount can be determined with mathematical precision.*" Massachusetts Bonding & Ins. Co. v. Johnston & Harder,

2. The plaintiff, Mr. Edgeworth, is a qualified insurance broker who represents many companies, some of which are involved in the school-child accident and health field. A plaintiff can be called as an expert if he is qualified. 5 Williston on Contracts, § 1346A, n. 6, p. 3782.

Inc., 343 Pa. 270, 278, 22 A.2d 709 (1941). (Emphasis supplied)

■ The experts' testimony in this matter is advisory and does not control the Court in reaching a reasonable approximation of damages. Their estimates of public response to this project range from one to sixty to ninety per cent of the printed applications. Such a wide range of anticipated response is attributable to the unprecedented method of merchandising the insurance program.

We also must give added weight to the effect which the large scale advertising program would have exerted on increasing the sluggish sales of Betty Crocker Gingerbread Mix. Militating against the national publicity is the common human suspicion and reluctance to take advantage of such offers. In conjunction with all of these factors is the offer itself which appealed to the protective instincts of parents to provide their school children with accident and health insurance at a nominal cost.

Therefore, after a careful evaluation of all of the foregoing tangible and intangible factors, it is our considered judgment that the public response to this offer would have been 25 per cent of the total applications printed. This would mean that $826,250.00 would have been the total premium received. The plaintiffs' contract called for a five per cent guaranteed commission on the first million dollars of premium which amounts to $41,312.50.

> " * * * In cases where plaintiffs fail to prove their damages exactly, we often make the best estimate we can, *even though it is really no more than a guess * * *. We will not accept the experts' testimony at its face value; we must make an award which by no possibility shall be too small.*" (Emphasis supplied) Judge Learned Hand in Sheldon v. Metro-Goldwyn Pictures Corp., 106 F.2d 45, 51 (2 Cir. 1939), aff'd. 309 U.S. 390, 406–408, 60 S.Ct. 681, 84 L.Ed. 825 (1939).

We believe that these figures represent a reasonable approximation of the projected return and commissions in this matter. Mathematical exactness is impossible in this case. "It is not our best guess that must prevail, but a figure which will favor the plaintiffs in every reasonable chance of error." Sheldon v. Metro-Goldwyn Pictures Corp., supra, 106 F.2d p. 51; also see Palmer v. Connecticut Ry. & Lighting Co., 311 U.S. 544, 561, 61 S.Ct. 379, 85 L.Ed. 336 (1940).

■■ The plaintiffs also claim that they are entitled to a *contingent* commission of 25 per cent of the anticipated 18 per cent profit in addition to their guaranteed commissions. Prospective profits which the plaintiffs would have received are a proper element of damages *provided the evidence establishes with reasonable certainty what the profits would have been had the contract not been breached.* Burks v. Sinclair Refining Co., 183 F.2d 239 (3 Cir. 1950); Willred Company v. Westmoreland Metal Mfg. Co., 200 F.Supp. 59 (E.D.Pa.1961).

■ In estimating prospective profits certain methods are considered proper and these methods are found in Williston on Contracts, § 1346A, as follows:

> "2. Evidence of past profits in an established business furnish a reasonable basis for estimating future profits.

> "3. Profits made by others or by the plaintiff himself in a similar business or under a similar contract, where the facts were not greatly different may also afford a reasonable inference of the plaintiff's loss.

> "4. The evidence of experts if based on anything more than individual opinion or conjecture has also been admitted."

These particular rules are not mutually exclusive, but they illustrate what is considered to be a reasonable basis for determining profits.

As previously stated, this insurance program, geared to sales of a food product, was without precedent in the industry. No evidence of past profits was possible nor could the experience of others be utilized. The only evidence which the parties presented dealt with the opinions of experts in the field of school-child accident insurance.

None of these experts had experience with a promotion of the nature involved in this case. There was a singular lack of any evidence which would afford a basis for a reasonable approximation of whether an insurance promotion of this variety would produce an 18 per cent profit. Even the plaintiffs' expert, an actuary of wide experience in the field, stated that he recommended to his clients that they avoid the school child accident and health business. (N.T.682) He further testified that loss ratios "are pleasantly surprising and sometimes are disappointing." (N.T.688) This testimony is hardly substantial enough to estimate the amount of profits that might have accrued in this venture.

Also, the testimony of the defendant's expert, a superintendent of an accident and health company, was to the effect that such a policy would have produced no profit. (N.T.709)

There are a number of speculative factors in this case which prevent a reasoned judgment of how much profit this program might have produced. While a 50 per cent loss ratio may be proper for setting the premium *before* the policies are sold, it does not necessarily follow that this ratio will remain constant after the policies are issued.

The final element of the plaintiffs' damages concerns their out-of-pocket expenses. These were incurred as a direct result of their efforts to formulate this program and eliminate any difficulties in its execution. Numerous plane trips and conferences with the defendant and its advertising agency, as well as conferences held with the insurance commissioners of various states constituted most of these expenses.

We feel that the $3,000.00 figure set by one of the plaintiffs, Mr. Edgeworth, is a modest amount. The defendant objects to this figure because the plaintiffs failed to produce any records to substantiate their claim, and further, that in a letter to defendant's counsel, the plaintiffs' attorney estimated the expenses to be $2,000 to $2,500 from an examination of the records. While the actual bills and records are the best evidence of these expenses we do not believe that Mr. Edgeworth's opinion is exaggerated or inadmissible. He very carefully enumerated his various trips and meetings and the time he spent in each city. (N.T.635–648) This element of damage was definitely established with reasonable certainty.

## CONCLUSIONS OF LAW

1. It has been established by the plaintiffs that they have in *fact* suffered substantial damages occasioned by the defendant's breach of contract.

2. Mathematical certainty as to the *amount* is impossible in this matter, but the plaintiffs have proved their damages with a reasonable approximation.

3. No contingent commissions can be determined with a fair degree of probability.

4. We find as a matter of law the following damages in favor of the plaintiffs: guaranteed commissions, $41,312.50; with interest from February 1, 1957 to February 1, 1964 at six per cent per annum $17,351.25; out-of-pocket expenses, $3,000.00; resulting in total damages in the sum of $61,663.75.

## ORDER

And now, this 27th day of February, 1964, judgment is entered in favor of the plaintiffs against the defendant for $61,663.75.