Hyman MARDER and Joshua Marder, t/a
Marder Associates

v.

CONWED CORPORATION.

Civ. A. No. 73–2810.

United States District Court,
E. D. Pennsylvania.

June 20, 1977.

John T. Clary, Philadelphia, Pa., for plaintiff.

Daniel E. Farmer, Philadelphia, Pa., for defendant.

## OPINION

LUONGO, District Judge.

Plaintiffs, Hyman and Joshua Marder, father and son, brought suit against Conwed Corporation for breach of contract and violations of the federal antitrust laws.[1] Plaintiffs alleged that Conwed wrongfully terminated an oral employment contract under which plaintiffs acted as Conwed's exclusive manufacturer's representatives in several mid-Atlantic states and in the District of Columbia. The alleged breach occurred in December 1971, but suit was not filed until December 1973. On July 17, 1974, I granted defendant's motion to dismiss plaintiffs' antitrust claims. *Marder v. Conwed Corp.,* 378 F.Supp. 109 (E.D.Pa. 1974). The remaining claims for breach of contract were tried before a jury in November 1975. The jury returned a general verdict for plaintiffs in the amount of $113,304.

Conwed has moved under Fed.R.Civ.P. 50(b) for judgment notwithstanding the verdict or in the alternative for a new trial. Plaintiffs filed a motion to mold the verdict to include interest of $37,920.26, later amended to $20,612.27,[2] on the jury's verdict. Viewing the evidence in the light most favorable to the party who secured a favorable jury verdict, as I am required to do on a motion for judgment n. o. v., *Thomas v. E. J. Korvette, Inc.,* 476 F.2d 471, 474 (3d Cir. 1973), the facts as adduced at trial can be summarized as follows:

In 1969, plaintiffs were two of the principals in a New York based firm of manufacturers' representatives known as D.G.M. Associates. As manufacturers' representatives, the Marders acted as sales agents for various manufacturers, selling manufacturers' products to wholesalers and retailers. In January 1969 D.G.M. Associates became Conwed Corporation's representatives for a new product known as "space dividers." Space dividers are movable partitions which are capable of being interlocked so as to create various sized and shaped work areas within a larger office. The partitions either sit directly on the floor or are raised slightly off the floor, and are approximately six feet in height. The Conwed-D.G.M. arrangement was by letter agreement from Conwed addressed to Hyman Marder. The letter set forth the commission rates and

---

1. The complaint was later amended to add charges of common law conspiracy and tortious interference with contract. Without opposition from plaintiffs, these charges were dismissed at the conclusion of plaintiffs' case at trial.

2. *See* Plaintiffs' Reply to Defendant's Brief in Opposition to Mold the Verdict.

provided that "[d]istribution of this patented system is granted and retained on the basis of performance, subject to periodic review."

Soon after D.G.M. Associates began to represent Conwed in the sale of the space dividers, it became apparent to Hyman Marder that the United States government was potentially the largest customer for the space partitions. In June 1969 Hyman Marder met with Richard Steinke, then Conwed's sales manager for the space dividers, to discuss sales to the United States government, and Steinke indicated that Conwed supported the idea.

In September 1969, D.G.M. Associates voluntarily dissolved. It was agreed among the principals that the Marders would retain the Conwed representation in the Mid-Atlantic region, including the District of Columbia. Conwed acquiesced in that arrangement. Conwed had a standard form agreement that its manufacturers' representatives signed. A copy of the form agreement was offered into evidence at trial. It provided for termination by either party for any reason on 30 days notice. Apparently no such written agreement was entered into between the Marders and Conwed. No explanation was offered by either side as to why the Marders had not signed such an agreement. Plaintiffs bring this suit upon an oral contract.

The Marders, doing business as Marder Associates, continued their efforts to interest the government in the dividers. In January 1970 Steinke and Hyman Marder met with Bernard Martin, who at the time was the chief of the General Services Administration (GSA), for procurement of furniture. Steinke had been told that the only feasible means of making large scale sales to government agencies of a new product was to have the product placed on the federal schedule, and the meeting was arranged with the purpose of obtaining information as to how an item is placed on government schedule.

When a product goes on government schedule for purchasing through GSA, a catalog and price list of the product are published and made available to all government agencies, and the various agencies are then permitted to purchase the items directly. If an agency wishes to purchase a product which is not on schedule, it must put its requirements out for public bid. The only exception to these procedures is known as "open market purchasing," which permits government agencies to purchase products on the open market directly so long as the total amount of the purchase does not exceed $2,500.

New products are not automatically placed on government schedule. A one page application for a new product schedule must be submitted to the government Business Service Center. Specifications and necessary certifications (e. g., fire retardancy) are submitted along with the application. If the Business Service Center concludes that the product warrants further consideration, it forwards the application to the Department of Standards and Specifications for evaluation. If that department concludes that the product is something the government can use, and if the product complies with required specifications, the department sends the application on to the appropriate division which, in the case of space dividers, is the furniture division. The appropriate division again evaluates the application. If the division approves it, it is sent to a government committee for further screening. If the committee approves the product, a contracting officer is appointed to negotiate the actual terms for selling it to government agencies. Thus, while the procedure for submitting an application is not complex, the chance that a particular application will receive final approval is small. No great expertise is necessary to prepare an application, but a knowledge of how the government reviews the applications and what it looks for may be useful in gaining approval. It is also helpful to try to interest individual agencies in the product prior to submission of the application because the approval process includes inquiries into whether agencies are interested in purchasing the product.

The fact that a product is placed on schedule is no guarantee that sales will be made. It is still up to the manufacturer's representative, or whoever is responsible for sales, to convince the agencies to purchase the product.

No application was made immediately following the January 1970 meeting to have the space dividers placed on schedule. Apparently Conwed had not yet finalized the pricing of the dividers and it was having production difficulties making impossible commitment to fill whatever orders might be placed by the government.

Hyman Marder continued what he described as his "missionary work" with various government agencies, including local offices of the Social Security Administration and the Central Intelligence Agency, through the Spring and Summer of 1970. On October 21, 1970, Marder again met with Martin of GSA regarding placing the space dividers on schedule.

In November 1970 Hyman Marder began discussions with Sid Eichner of General Office Furniture Wholesalers (hereinafter GOFW) with the view to having GOFW act as the dealer responsible for the actual sale, layout, delivery, installation, and maintenance of the space partitions to the government agencies. Hyman Marder felt that his organization did not have the manpower necessary to handle the nationwide volume of space divider sales which he foresaw. Alternatively, Conwed would have had to assume the responsibility for servicing the government agency accounts, a responsibility it did not want.

At the same time Hyman Marder was having discussions with GOFW, he began to look for a third individual to join him and Joshua Marder. Hyman Marder considered a third person necessary to assist the Marders because of the added business created by the space dividers, and also as the first step leading to his eventual retirement from the business. In December 1970 Hyman Marder took on Bernard Vail and made him an equal one-third partner. Soon thereafter the name of the partnership was changed to Marder-Vail Associates.

Vail was hired to assist in all aspects of the partnership's business, with the sale of the Conwed partitions to be a primary responsibility. Hyman Marder chose Vail because he felt that Vail had the ability to deal successfully with government agencies. As the sale of the dividers increased, a proportionately greater percentage of Vail's time was spent on the government sale of dividers, and eventually he devoted himself to it almost exclusively.

Soon after Vail joined the Marders, negotiations with GOFW were completed, making GOFW the exclusive agency for the sale of space dividers to the federal government. Conwed's approval was obtained, and Conwed notified its other sale representatives that GOFW was to have exclusive responsibility for space divider sales to the federal government.

The Marders and Vail continued to sell the space dividers to commercial customers through 1971. During 1969, 1970, and the first half of 1971 small quantity sales of the dividers were also made to various government agencies. As previously described, agencies could purchase small quantities directly, without having to accept bids and without the item being on government schedule.

In June 1971 the space dividers were accepted on government schedule. The contract between GSA and GOFW was for a period of one year, with the government having the option to renew the contract for each of the two successive years. The Marders and Vail, in conjunction with GOFW, intensified their efforts to sell the space dividers. No evidence was offered at trial as to the volume of space divider sales for the second half of 1971.

On Sunday, December 12, 1971, the Marders and Vail had scheduled a meeting for the purpose of discussing incorporation of their partnership. When Vail arrived at the meeting he announced that he wished to leave the partnership, indicating that he had received other job offers. After discussion, Hyman Marder handwrote a dissolution agreement, which the three partners

signed. The agreement concludes with the following:

". . . . For a period of ninety days after January 1, 1972, Vail will not solicit nor accept any lines now represented by Marder/Vail Associates for the commercial market. This excludes the U.S. government market."

The dissolution was communicated to Conwed in the following days. On December 21, 1971, Frederick Geib of Conwed wrote to the Marders informing them that ". . . we must cancel the Federal Government Sales Portion of our agreement with Marder Associates, the termination date to be January 23, 1972." As a reason for the termination, the letter stated:

"Considering the specific personal specialization of government and commercial accounts within Marder-Vail Associates, we have been most concerned in maintaining Conwed sales continuity from each market. Knowing the great amount of personal effort each member of your organization has extended to keep your business a success, we feel our decision will enable each individual to achieve his maximum potential with Conwed Space Control Products."

When Hyman Marder contacted Conwed for a further explanation, he was told that Conwed felt it was in its best interests to continue Vail as liaison between the government and GOFW. A letter from Conwed to Vail dated February 2, 1972 formally offered him the position of an independent sales representative of Conwed's Space Control Division.

Vail continued as Conwed's manufacturer's representative to the United States government through at least 1974. Undisputed evidence submitted by plaintiffs at trial indicates the following amounts of series 800 and 900 partition sales to the government by Vail from 1972 through August 1974:

| | |
|---|---|
| 1972 | $ 939,270.58 |
| 1973 | 2,253,096.74 |
| 1974 (through August) | 1,344,206.42 |

During this period Vail was paid the following commission rates on his sales to the government:

| | |
|---|---|
| January 1972–November 1972 | 8.0% |
| December 1972–May 1973 | 6.5% |
| June 1973–April 1974 | 5.5% |
| May 1974–August 1974 | 3.0% |

At these commission rates, Vail's commissions for 1972 through August 1974 totaled:

| | |
|---|---|
| 1972 | $ 74,604.32 |
| 1973 | 132,726.00 |
| 1974 (through August) | 48,464.25 |

### Discussion

The Marders alleged, and sought to prove at trial, that because of the "missionary work" directed at the various government agencies by the Marder Associates, and later by the Marder-Vail partnership, and because the partnership was responsible for getting the space divider partitions on government schedule, they, the Marders, were entitled under an oral contract with Conwed to be retained as Conwed's government sales representatives for such a period of time as would enable them to reap the benefits, by way of commissions, from sales made to the government under the schedule contract.[3]

The Marders acknowledge that normally a contract of employment which does not specify the length of employment is terminable at will. They rely on the exception to that rule; where an employee furnishes consideration in addition to mere services, he is deemed to have secured employment for at least a reasonable period if the duration is not otherwise specified. *See* 9 *Williston on Contracts* § 1017A. The missionary work and the time and expertise the Marders utilized to have the dividers placed on government schedule were, the Marders argue, additional consideration which entitled them to be retained as sales representatives

**3.** A few months after the Marders were terminated as government sales representatives, they were also terminated as commercial representatives for Conwed, and Vail took over as sales representative for Conwed's commercial customers in conjunction with his position as government sales representative. The Marders do not contend that Conwed wrongfully terminated them as sales representatives as to Conwed's commercial customers.

to the government so they would receive the commissions paid by Conwed on space divider sales to the government.

The jury's verdict reflects a finding by it that the plaintiffs were entitled to be retained by Conwed after the space dividers went on schedule for a reasonable time, and a reasonable time was such that their extra efforts, i. e., additional consideration, would be compensated by commissions totaling $113,304. The defendant seeks to have this conclusion overturned on one or more of several grounds, through either the entry of a judgment n. o. v. or the grant of a new trial.

■ The standards for granting a motion for judgment n. o. v. are the same as those governing the direction of a verdict. *See Hallmark Industry v. Reynolds Metals Co.*, 489 F.2d 8 (9th Cir. 1973), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974). Judgment n. o. v. may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment, and that conclusion is contrary to the jury's verdict. *Brady v. Southern Railway Co.*, 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239 (1943); *Riddle v. Datko*, 448 F.2d 408 (3d Cir. 1971). The function of a motion for judgment n. o. v. is to test the sufficiency of the evidence presented to the jury; if the evidence is legally insufficient to sustain the jury's verdict, judgment n. o. v. is proper. *Fleet Messenger Service, Inc. v. Life Insurance Co.*, 315 F.2d 593 (2d Cir. 1963); *Lebrecht v. Bethlehem Steel Corp.*, 402 F.2d 585 (2d Cir. 1968); 5A Moore's Federal Practice ¶ 50.07[2] at 2356. The evidence is legally insufficient to permit the jury's verdict to stand where the facts and all inferences therefrom favorable to the non-moving party would not permit a reasonable man to come to the conclusion reached by the jury. 5A Moore's Federal Practice ¶ 50.02[1] at 2320.

■ Federal Rule of Civil Procedure 59(a) provides that the court may order a new trial "in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States . . . ." A new trial may be granted where there was substantial error in the admission or exclusion of evidence; error in the court's instructions to the jury; where the jury's verdict was inadequate or excessive; or where the verdict is against the weight of the evidence. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940); 5A Moore's Federal Practice ¶ 50.03[2] at 2334. A new trial may also be granted where the evidence was legally insufficient to go to the jury. 5A Moore's Federal Practice ¶ 50.03[2] at 2334. *See infra.*

■ The grant of a new trial is committed to the sound judicial discretion of the trial court. *Montgomery Ward & Co., supra;* 6A Moore's Federal Practice ¶ 59.05[5]. The Court may not substitute its own judgment for that of the jury merely because it may have reached a different conclusion, however.

Federal Rule of Civil Procedure 50(b) provides that a motion for a new trial may be joined with a motion for judgment n. o. v., or the new trial may be prayed for in the alternative. Subdivision (c) of Rule 50 requires that where both motions are made, if the judgment n. o. v. is granted, the court shall also rule on the motion for a new trial "by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial." *See Montgomery Ward & Co., supra.*

■ Where both a motion for judgment n. o. v. and a motion for a new trial are filed, although the court determines that the moving party is entitled to judgment in his favor, in the exercise of proper discretion, the court may instead grant a new trial. *Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 215–16, 67 S.Ct. 752, 91 L.Ed. 849 (1947); 5A Moore's Federal Practice ¶¶ 50.11, 50.13[1]. The exercise of that discretion is proper "where the circumstances indicate that because of some technical failure as to proof, because other evidence

is available, or because of some other related matter fairness dictates that the non-moving party be given another opportunity to make good his claim or defense." 6A Moore's Federal Practice ¶ 59.08[5]. *Cone v. West Virginia Pulp & Paper Co., supra,* at 216–17, 67 S.Ct. 752.

Conwed has submitted the following as grounds for entering a judgment n. o. v.: (1) plaintiffs' evidence on damages was legally insufficient to sustain the jury's verdict; (2) plaintiffs' evidence as to their ability to perform their obligations under the contract was legally insufficient; and (3) plaintiffs' evidence that the contract with Conwed was to continue for a reasonable period of time was legally insufficient.

Defendant's grounds for new trial are: (1) plaintiffs' evidence on damages was legally insufficient to sustain the jury's verdict; (2) the jury's award of damages was grossly excessive; (3) the jury's verdict was an illegal quotient verdict; (4) the admission of Hyman Marder's testimony as to conspiracy was prejudicial error; and (5) the court erred in certain instructions to the jury, including (a) the instruction regarding the effect of the dissolution agreement, (b) the instruction that the jury should consider whether Conwed gave the Marders the opportunity to perform the contract after Vail left the partnership, and (c) the refusal to instruct the jury that the prospective poor performance of the Marders anticipated by Conwed justified Conwed's termination of the Marders' representative contract. I will consider each ground raised by Conwed in its motions.

I. *Sufficiency of Evidence on the Marders' Ability to Perform*

█ Examining defendant's arguments in support of the motion for judgment n. o. v., I will consider first its contention that plaintiffs offered insufficient evidence of their ability to perform their contract with Conwed after Vail left the partnership. Defendant relies on *United States v. Penn Foundry & Manufacturing Co.,* 337 U.S. 198, 69 S.Ct. 1009, 93 L.Ed. 1308 (1949). In that case, the plaintiff had entered into a

contract for the production of gun mounts for the government. The government cancelled the contract when it became apparent that the plaintiff would be unable to perform. The plaintiff sued for loss of anticipated profits. The Supreme Court, in reversing the judgment of the Court of Claims for the plaintiff, held that plaintiff had failed to establish its ability to perform as an essential element of its case. Conwed asserts the same deficiency of the Marders in the instant case.

*Penn Foundry & Manufacturing Co.* was a suit originally brought in the Court of Claims against the federal government, and, therefore, was governed by federal common law. The instant suit is brought under the diversity jurisdiction of this court and is therefore governed by Pennsylvania law. I have found no Pennsylvania case which requires plaintiff in a suit for breach of contract to prove as an element of its case its "willingness, readiness and capacity" to perform, 337 U.S. at 210, 69 S.Ct. 1009, but even if the Marders were required to offer evidence of their ability to perform, there was ample evidence of Hyman Marder's ability to act as Conwed's sales agent to the government. Hyman Marder obviously knew more about the manufacturers' representative business than did Vail, and at the time Vail was hired, he and Hyman Marder knew equally little about selling to the federal government and getting a product on government schedule. It was Hyman Marder who knew how to bring GOFW in as wholesaler for the partitions. Hyman Marder was responsible for the initial sales contacts with the government agencies. I conclude that if plaintiffs were required to offer evidence of their ability to perform their agency responsibilities for Conwed the evidence submitted at trial was sufficient to meet that requirement.

II. *Sufficiency of Evidence that the Marders' Employment Was to Continue for a Reasonable Period*

█ Conwed's third proffered ground for judgment n. o. v. is that the evidence presented at trial was insufficient "to show

that [plaintiffs'] contract with Conwed was intended to continue for a reasonable period of time." Defendant's Brief at 26.

As previously noted, a contract of employment which does not specify otherwise is normally terminable at will:

"[W]hen a contract provides that one party shall render services to another, or shall act as an agent, or shall have exclusive sales rights within certain territory, but does not specify a definite time or prescribed conditions which shall determine the duration of the relation, the contract may be terminated by either party at will." *Cummings v. Kelling Nut Co.*, 368 Pa. 448, 451, 84 A.2d 323, 325 (1951) (Citations omitted).

The presumption of terminability at will may be overcome, however, by evidence establishing some tenure of employment. The intention of the parties governs:

"One relying on the contract as providing for a reasonable length of time [of employment] must establish something in the nature and circumstances of the undertaking which would create the inference that a definite or reasonable period of employment was actually contemplated by the parties." *Id.* at 452, 84 A.2d at 325.

One means of showing that the parties had such an intent is to demonstrate that the agent or employee furnished consideration above and beyond merely his services. 9 Williston on Contracts § 1017A (3d ed.); Restatement of Agency § 442 and Comment (c) thereto. Such extra consideration might take several forms, including sacrificing other work opportunities, or some extraordinary investment by the employee or agent which the parties understand will be recouped by employment over a period of time. *See Lubrecht v. Laurel Stripping Co.*, 387 Pa. 393, 127 A.2d 687 (1956); *Cummings v. Kelling Nut Co., supra.*

The Marders sought to prove at trial that they and Conwed understood that the Marders' extra efforts—"missionary work" —in developing agency interest in the partitions and getting them on schedule would be rewarded by their being retained as sales representatives for the partitions for such time as would enable them to recoup their investment of "missionary work"—their extra consideration. Conwed now argues that the Marders failed to offer sufficient evidence at trial from which the jury could conclude that the parties had such an intent.

The following evidence was submitted at trial from which the jury could have found that the Marders' contract with Conwed was to extend for a reasonable time: The Marders took on responsibility as sales representatives for an entirely new product. (N.T. 131, 165; Deposition of James Foster at 8) Being not only a new "brand," but an entirely new product, considerable sales efforts were necessary by the sale representatives not only to interest prospective buyers but also simply to inform them of the existence of the dividers and their various uses. The Marders took responsibility for much of the initial publicity for the product, setting up and attending trade show displays of the partitions. (N.T. 166–169) Hyman Marder conceived and implemented the idea of using a furniture wholesaler, GOFW, to distribute and service the partitions to the government. (N.T. 349–50) Hyman Marder made numerous—at least 20—trips to the District of Columbia to visit government agencies and interest agency personnel in the Conwed partitions. The contacts with the agencies had two purposes; both to sell the partitions directly and to develop general agency interest which would later assist in having the partitions placed on schedule. Hyman Marder also made the initial contacts with GSA for the purpose of learning what steps were necessary to have the partitions placed on government schedule. The Marders hired Bernard Vail, who during some initial period while he was learning the business may have been a liability rather than an asset to the partnership. Finally, James Foster, the general manager of the space control division at Conwed, testified that insofar as what the Marders were to receive,

"it wasn't anything other than giving them their commission on one hell of a

large order is all that they would get out of it, and I don't know that when the contract was through that was that." Deposition of James Foster at 22.

In support of its contention that the evidence submitted was insufficient for a finding of a contract for a reasonable time, Conwed relies on *Cummings v. Kelling Nut Co.,* 368 Pa. 448, 84 A.2d 323 (1951). Cummings brought suit on an oral employment contract, alleging that he had been wrongfully terminated as a salesman of defendant's product, assorted nuts. Plaintiff was discharged after nine years as a salesman for defendant. He claimed that his earnings in the first years of his employment were relatively small in comparison with his expenditures of time and money, and that it was the intention of the parties that the employment continue for such reasonable time as would enable him to be fairly compensated for the services and money he had expended in the furtherance of defendant's business. Plaintiff testified that when he initially interviewed with the president of the defendant company the president " 'admitted that their business was very small at this time but a salesman coming with them would be building the business for himself; that the remuneration the first few years might not amount to much but in time I would be able to build a foundation for the future that would be just the same as being in business for myself without investment.' " *Id.* at 451, 84 A.2d at 325.

The Pennsylvania Supreme Court, viewing the facts most favorably to the plaintiff, held that "the evidence was insufficient to permit the jury to find that the plaintiff's employment was other than one terminable at will." *Id.* at 457, 84 A.2d at 327. Examining the statement of the defendant company's president that profits might be small in the first years, but that the plaintiff would be building a foundation for the future as if he were in business for himself, the court concluded that the statement did not amount to a promise that plaintiff would be retained until he had recovered, by way of commissions, remuneration over and above his traveling expenses, sufficient to compensate him not only for recent efforts, but for his past efforts and expenses in the development of his territory. "If such representations by the employer were to create an implied promise of continuous employment over any period of time, practically no employment would be terminable at will." *Id.* at 453, 84 A.2d at 325. The court took into consideration several letters written by plaintiff to the defendant company following his discharge. The language of the letters strongly suggested an assumption on the plaintiff's part that his employment could be terminated at any time. *See id.* at 454–55, 84 A.2d 323.

The trial court had found three things which the jury could find as sufficient additional consideration to make the employment contract not terminable at will. The Supreme Court disagreed, finding "no consideration given by the plaintiff beyond the services necessary to the performance of his duties." First, qualification for the employment did not amount to additional consideration. Second, if plaintiff had been forced to forego other employment, that might amount to additional consideration, but in this instance there was no evidence that plaintiff had given up any other business in order to sell the nuts. Third, if "plaintiff had to invest his time and money for traveling expenses, not entirely for present benefits, but for adequate compensation to be realized in the future by way of commissions or repeat orders secured with little, if any additional effort on the part of the plaintiff . . . ." that did not amount to additional consideration such as would make the contract terminable only after a reasonable period.

The Marders in turn rely on *Lubrecht v. Laurel Stripping Co.,* 387 Pa. 393, 127 A.2d 687 (1956), where the Pennsylvania Supreme Court upheld the jury's verdict that an employment contract was not terminable at will, but the employee's right to employment embraced a period beyond the date he was discharged by defendant. Lubrecht was terminated as general manager of all of the mining and stripping operations of the defendant company. His written employment contract did not specify the

length of his employment, and he was paid on the basis of the number of tons of ore mined. In affirming the jury's verdict, the Pennsylvania Supreme Court repeated:

"[I]t is the intention of the parties which is the ultimate guide, and, in order to ascertain that intention, the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement." 387 Pa. at 396, 127 A.2d at 690.

The Court held that the following evidence warranted the jury's conclusion that the plaintiff's right to employment embraced a period beyond the date of his discharge: (1) plaintiff had a skill which specifically fitted him to the job he held with defendant; (2) plaintiff had sacrificed other good opportunities in order to assume the job with defendant; and (3) the written employment contract, itself, implied that the plaintiff's employment would continue so long as the defendant's mining and stripping contracts continued. *Id.* at 397, 127 A.2d at 690.

Since the time the parties to this suit submitted their post-trial briefs, the Court of Appeals for the Third Circuit announced its decision in *Bravman v. Bassett Furniture Industries, Inc.*, 552 F.2d 90 (3d Cir. 1977). The district court had directed a verdict against plaintiff in a suit alleging, *inter alia,* breach of an employment contract. Bravman was a furniture manufacturers' sales representative for Bassett Furniture, a manufacturer of home furniture. In 1959 Bassett Furniture offered Bravman the opportunity to sell the products of its table division as well as its case goods, and to sell the products of Bassett Mirror Company, a separate corporation. This offer contemplated that Bravman's assigned sales territory would be reduced, and that he agreed not to represent any other furniture manufacturers in the future as he had in the past. Bravman accepted the offer and terminated his relationships with all other furniture companies. In 1970 Bravman was informed by Bassett Furniture that he no longer represented Bassett Furniture's line of table products or Bassett Mirror's line of products, leaving him with only Bassett Furniture's case goods to represent. Bravman protested but eventually acquiesced and signed an acknowledgement agreeing to the changes. In 1972 Bassett terminated Bravman's representation of even the case goods because it discovered that Bravman had undertaken the representation of other furniture manufacturers selling furniture other than case goods. Bravman sought to prove that his employment relationship with defendants was one which was to continue for a reasonable period beyond the date on which he was terminated. The defendants contended that the relationship was terminable at will, and even if it was not, the termination was justified by Bravman's breach of contract in again handling the lines of other furniture manufacturers.

The Court of Appeals held that the directed verdict was improper. Citing *Cummings v. Kelling Nut Co.*, 368 Pa. 448, 84 A.2d 323 (1951), it concluded that there had been sufficient evidence of additional consideration by Bravman to support a finding that the contract was intended to be for a reasonable period, listing as additional consideration: (1) Bravman's agreement not to represent any other furniture manufacturers, including giving up those he already represented; (2) Bravman personally guaranteed the credit worthiness of many of the accounts from whom Bravman solicited orders; (3) at Bassett Furniture's insistence Bravman hired a full time associate to help cover Bravman's assigned territory; and (4) Bravman's only source of compensation for the effort expended in developing accounts in his assigned territory was commissions on orders which Bassett Furniture or Bassett Mirror chose to accept.

After careful comparison of the instant case with the facts and results reached in *Cummings v. Kelling Nut Co., supra, Lubrecht v. Laurel Stripping Co., supra,* and *Bravman v. Bassett Furniture Co., supra,* I conclude that the Marders submitted sufficient evidence—although barely so—from which the jury could find that their contract with Conwed was intended by the parties to be for a reasonable period. The

sale of the Conwed space partitions to the government required unusual and, at least in that sense, extraordinary efforts. Sales to the government over $2,500 required that the partitions be placed on government schedule. Although the application procedure was not itself burdensome, there was evidence that substantial contact with agencies before hand was an important and perhaps necessary step in getting an item on schedule. Hyman Marder spent substantial time—his missionary work—in developing that agency interest with the only substantial benefit derived therefrom being the eventual placing of the partitions on schedule. In any other customer market the Marders would not have been faced with this amount of introductory sales work with no expectation of making substantial sales directly therefrom. Furthermore, the Marders agreed to take on substantial responsibility for introducing a new product concept into the marketplace. Hyman Marder also took responsibility for integrating GOFW as distributor and servicing agent for the partitions. This was not the kind of effort that would normally be required of a manufacturers' representative. As in *Bravman v. Bassett Furniture, supra,* the Marders hired a full time associate, in this case a partner, to assist in sales efforts, but unlike *Bassett,* Vail was not hired at the manufacturer's insistence or even request. There was testimony, however, that undertaking sales to the federal government effectively required that the Marders expand their organization. Finally, there was James Foster's testimony that the Marders were to get their commission "on one hell of a large order."

The instant case is distinguishable from *Cummings v. Kelling Nut Co., supra.* The Marders do not rely on oral representations made to them by Conwed, nor do they rely on any special expertise in making sales to the federal government, and their preliminary investment amounted to more than traveling expenses, including the hiring of Vail.

At least one factor in *Lubrecht v. Laurel Stripping Co., supra,* on which the court based its conclusion that the contract was not terminable at will, is similar to the facts of the instant case. In *Lubrecht* the written employment contract suggested that it was to be coextensive with the employer's mining contracts. In the instant case the jury could infer that since getting the dividers on schedule in itself provided no benefit to the Marders, the parties understood that the Marders would be retained as sales representatives during some period of time while the dividers were on schedule. Again, at least one factor relied upon by the court in *Bravman v. Bassett Furniture Co., supra,* in finding evidence sufficient to support a finding of a contract for a reasonable period, is also present to some extent in the instant case. *Bravman* had been required by Bassett Furniture to hire a full time associate. Conwed did not require that the Marders bring a new partner into the business, but practical necessity may have required that the partnership be expanded, as Hyman Marder testified, to bring in someone of sufficient ability to assist with the government business. Although Vail later withdrew from the partnership, the future of the Marders' business was certainly affected, conceivably for the worse, by the inclusion of Vail, a step which Conwed did not discourage.

Admittedly, for the jury to find a contract for a reasonable period they had to give little or no weight to some arguably significant evidence, especially the Marder-Vail dissolution agreement providing that Vail would not solicit any lines then represented by the Marder-Vail partnership, but "[t]his excludes the U. S. government market." Hyman Marder's missionary work did result in some immediate sales of the partitions. His twenty or so trips to Washington also involved efforts to sell other lines of products he represented. The schedule application procedure was itself very simple and required no expertise. Considerable sales efforts were still required after the partitions were on schedule; being on schedule only gave the representative a "hunting license" to sell the partitions. There was no evidence offered at trial that the cost of Vail to the partner-

ship exceeded the commissions he earned in his first year. This point is discussed more fully below. Also, there was no evidence at trial that the Marders forewent any other valuable opportunities in order to act as manufacturers' representatives to the government for the Conwed partitions.

In my view, the sum of the evidence weighed against a finding that the parties contracted for a reasonable period, but that is not the test for judgment n. o. v. The question is whether, ignoring the unfavorable evidence, there was sufficient favorable evidence that the jury could find that the parties contracted for a reasonable period. In both *Lubrecht v. Laurel Stripping Co.* and *Bravman v. Bassett Furniture Co.*, where the courts held the evidence sufficient to find a contract for a reasonable period, factors favorable to the plaintiffs were present that are not present in the instant case. These cases and *Cummings v. Kelling Nut Co.* make clear, however, that it is the intention of the parties that governs. Viewing the evidence submitted at trial in that light, I conclude that sufficient, albeit hardly overwhelming, evidence of extra effort implying an intent to contract for a reasonable period was submitted by plaintiffs so as to withstand judgment n. o. v.

Defendant contends that even if there was sufficient evidence from which the jury could find a contract for a reasonable period, the evidence was insufficient for the jury to determine what a reasonable period would be. That is, there was insufficient evidence as to what period of employment would permit the Marders to earn a fair return on their investment, i. e., their extra consideration. Evidence was lacking, argues defendant, both in terms of what the worth of the Marders' extra consideration was, and in terms of what period of employment would have earned them net profits sufficient to recoup their investment. This argument raises even more serious questions as to the adequacy of the evidence submitted by plaintiffs at trial than does the argument just discussed. Because the issue is closely related to defendant's argument that plaintiffs submitted insufficient evidence of damages, it will be discussed next with that issue.

### III. Insufficiency of Evidence on Damages: Grounds for Judgment N.O.V. or New Trial

Conwed contends that, assuming it breached its employment contract with the Marders, the Marders nevertheless failed to submit sufficient evidence at trial from which the jury could determine the damages incurred by the Marders, and, therefore, Conwed is entitled to judgment n. o. v. or at least a new trial. The Marders contend that there was adequate proof of their damages. They contend they proved their lost profits by evidence of the commissions earned by Vail from sales of the partitions to the government during the three years they were on schedule, representing commissions the Marders would have earned had they not been terminated, and by evidence of expenses Vail incurred during the year prior to Conwed's termination of the representative contract.

It is undisputed that in a suit for breach of contract " 'a plaintiff who claims damages for the loss of a contract is as much bound to prove that he sustained damages as to prove the contract itself. The jury cannot be asked to guess. They are to try the case upon evidence, not upon conjecture.' " *Rightmire v. Hirner*, 188 Pa. 325, 329–330, 41 A. 538, 539 (1898). "[D]amages for breach of contract cannot be recovered unless the evidence affords sufficient basis for estimating them with reasonable certainty." *William B. Tanner Co. v. WIOO, Inc.*, 528 F.2d 262, 272 (3d Cir. 1975); *Commonwealth Trust Co. v. Hachmeister Lind Co.*, 320 Pa. 233, 238, 181 A. 787, 789 (1935); Restatement of Contracts § 331 (1932). *See also Burks v. Sinclair Refining Co.*, 183 F.2d 239, 242 (3d Cir. 1950). Where the plaintiff seeks to prove lost profits as his damages, he may do so through proof of gross profits he would have earned less expenses he would have incurred. If such proof is offered, proof of expenses must likewise be sufficient for estimating them with reasonable certainty. *See Nakles v. Union Real Estate Co.*, 415 Pa. 407, 411, 204 A.2d 50

(1964); *French v. Pullman Motor Car Co.*, 242 Pa. 136, 139, 88 A. 876 (1913). In some instances it is unnecessary to prove certain overhead expenses, but in the case of a sales representative contract, traveling and lodging expenses must be proved. *See Morrow-Smith Co. v. Cleveland Traction Co.*, 296 Pa. 377, 145 A. 915 (1929).

Conwed divides its argument that there was insufficient evidence of damages into four parts, based on plaintiffs' efforts to prove damages as lost commissions on the sale of the dividers: (1) plaintiffs offered insufficient evidence as to the expenses they would have incurred during the years in which on schedule sales of the partitions were made; (2) plaintiffs failed to prove the commissions they would have earned themselves as opposed to what Vail earned during the period the partitions were on schedule; (3) plaintiffs failed to present any evidence as to the income they were able to realize from other sources as a result of not having to act as sales representatives for the space dividers; and (4) plaintiffs failed to prove that they were entitled to commissions from sales of the later model dividers ("Series 800"), even if they were entitled to be retained as sales representatives for the earlier model ("Series 900").

The sum of the evidence relating to damages was small indeed. Plaintiffs submitted into evidence a table of the sales of dividers and the commissions received by Vail on a monthly basis from January 1972 through August 1974. They also submitted a memorandum listing Vail's commission rates between 1972 and 1975. At trial Vail testified as to why his commission on sales to the government was first cut from 8 percent to 6.5 percent, and then to 5.5 percent, and finally to 3 percent. The only other evidence relating to damages was the following testimony by Joshua Marder in response to questions by the Marders' counsel:

"Q. Mr. Marder, during the year 1971 do you know what Mr. Vail's draw and expenses were for that year?

A. Somewhere in the neighborhood of 20 thousand dollars.

Q. Approximately how much of his time was devoted to the Conwed government line?

Defendant's Counsel: Objection.

The Court: Overruled.

A. A guess on my part would be in the neighborhood of two-thirds.

Defendant's Counsel: Objection. I move to strike that answer, Your Honor. It is a guess.

The Court: Insofar as it is a speculation, members of the jury, you will disregard the answer.

* * * "

Beginning with the defendant's second point, that proof of Vail's commissions during 1972 through 1974 was insufficient evidence of what the Marders' gross commissions would have been during that period had they been retained as sales representatives to the federal government, in my view such proof was sufficient. While there is no assurance that the Marders could have duplicated the sales made by Vail, it was reasonable for the jury to infer that the Marders could have matched the successful sales efforts of Vail, at least to an extent that the jury could base the lost commissions of the Marders on the commissions earned by Vail. At the end of 1971 when the partnership terminated, Vail had little, if any, more expertise in the government market than Hyman Marder. Hyman Marder had had more experience than Vail in marketing the partitions, which the jury could infer reasonably compensated for any superior salesmanship ability of Vail. It was Hyman Marder that Conwed initially sought out, and, as plaintiffs point out, a certain amount of the sales effort was the responsibility of GOFW, whether the Marders or Vail acted as manufacturers' representative. The jury could properly infer that the Marders could have hired a competent salesman who would provide the needed manpower for the Marders to maintain their other accounts and pursue the government sales with vigor.

In *Pittsburg Gauge Co. v. Ashton Valve Co.*, 184 Pa. 36, 39 A. 223 (1898), the defendant breached an exclusive sales agency

agreement and the plaintiff sued for lost commissions. The Pennsylvania Supreme Court affirmed the trial judge's refusal of a proposed instruction to the jury and thereby affirmed the right of the jury to consider as evidence of plaintiff's damages the business done by the defendant's own sales agent in the same territory after the breach. At the time of the breach the agent's sales had been increasing. The case was subsequently cited in *Macan v. Scandinavia Belting Co.*, 264 Pa. 384, 392–93, 107 A. 750, 753 (1919), for the proposition that:

"[W]here an agent agreed to sell his principal's goods within a certain district for a fixed period and before the expiration of the time the principal declared the contract at an end without sufficient cause, the agent may show the extent and volume of the business done in the territory under both his agency and that of his successor as bearing upon the question of damages. . . ."

In both *Pittsburg Gauge Co.* and *Macan* the only evidence as to the lost gross profits resulting from the principal's breach was the profits earned by agents who took over the plaintiff-agent's territory. I find no significant distinguishing factors in the language and facts of those cases and the instant case. Vail sold the same product as the Marders would have been selling, and he sold it in the same territory—to United States government agencies. *See also Massachusetts Bonding & Insurance Co. v. Johnston & Harder, Inc.*, 348 Pa. 512, 521–22, 35 A.2d 721 (1943); *Massachusetts Bonding & Insurance Co. v. Johnston & Harder, Inc.*, 343 Pa. 270, 278–280, 22 A.2d 709 (1941).

In conclusion, the Marders produced sufficient evidence at trial from which the jury could reasonably calculate the amount of gross commissions which the Marders would have earned had they not been terminated as Conwed's manufacturers' representatives.

Having submitted sufficient evidence of gross lost commissions resulting from Conwed's termination of the representative contract, it remained incumbent on the plaintiffs to submit adequate evidence of their total expenses for the period during which the commissions would have been earned so to enable the jury to determine the amount of the Marders' lost net profits, i. e., their damages. After careful examination of all the evidence, I reach what I believe is the only reasonable conclusion, that plaintiffs submitted insufficient evidence of what their actual expenses were during the period prior to Vail's departure from the partnership, and, based on that lack of evidence and the failure to submit any other type of proof, the Marders failed to submit sufficient evidence as what their expenses would have been during whatever period the jury determined that the Marders were entitled to be retained as Conwed's representatives.

The only evidence submitted at trial relating to the Marders' expenses during the year Vail was with the partnership was Joshua Marder's testimony that Vail's draw and expenses for 1971 were "[s]omewhere in the neighborhood of 20 thousand dollars." From that statement alone it is impossible to discern any idea of what even Vail's expenses were for 1971. It was left unexplained what was meant by "draw and expenses." "Draw" usually refers to regular weekly or monthly amounts which a salesman is paid against which are credited commissions actually earned. There was no evidence as to Vail's earned commissions for 1971, consequently no basis for determining what portion, if any, of the "draw" represented a cost of the Marders' operation. Beyond that, the jury was still left without any idea of what Vail's expenses were because draw and expenses were not stated separately. If "draw and expenses" were viewed by the jury as Vail's total cost to the partnership during 1971, it is totally misleading. Some portion of the $20,000 must have represented Vail's share of the profits as an equal one-third partner in the partnership, but the jury had no way of knowing what portion of the $20,000 that was. Furthermore, Joshua Marder could only "guess" that Vail was spending "in the neighborhood of two-thirds" of his time selling the Conwed partitions.

The total expenses of the partnership in 1971 attributable to the sale of the partitions is further clouded by the undisputed testimony that Hyman Marder was still devoting substantial time in 1971 to selling the partitions and doing "missionary work" to interest the agencies in the partitions. There was no evidence submitted as to Hyman Marder's expenses: his travel and lodging expenses, entertainment expenses, telephone, postage, or office and clerical expenses. The jury was left with totally insufficient evidence, and could have done nothing but speculate as to the partnership's expenses related to efforts to sell the partitions in 1971.

The jury, without any means of determining with reasonable certainty the amount of the plaintiffs' expenses related to 1971 sales and missionary work on the partitions, was on even more slippery footing in attempting to determine what the expenses related to partition sales would have been for the years 1972 through 1974. Such expenses had to be deducted from the commissions earned in those years in order to calculate the Marders' lost net profits. As noted previously, having the partitions on schedule did not guarantee any sales. It was still necessary to go to the individual agencies, convince them of the value of the partitions, determine the agencies' exact needs, and close the sales. All the expenses traditionally associated with sales efforts would be present. There was no testimony as to what portion of Vail's time was spent in selling Conwed's partitions to the government during 1972 through 1974, or what his expenses were for that period. The Marders could have attempted to present evidence showing the relationship between what their expenses were in 1971 and what they would have been had they remained as Conwed's representatives, but no such effort was made. Thus, even if expenses for 1971 had been sufficiently presented to it, the jury was left without the means by which to reasonably calculate expenses for the subsequent years. Since the jury had no meaningful figure for 1971 expenses, however, it was completely without foundation or guidance for making any

estimate as to later expenses. I conclude, therefore, that plaintiffs' evidence as to the expenses they would have incurred in selling Conwed partitions had they remained as representatives was insufficient, and, thus, plaintiffs' evidence as to what their net profits would have been was insufficient as a matter of law.

The defendant also attacks the sufficiency of plaintiffs' proof of damages by questioning whether plaintiffs were not required to offer evidence as to the amount by which their income was increased by sales made on other accounts as a result of their not having to devote time and resources in the discharge of their responsibilities as Conwed's space divider sales representatives to the government. Defendant relies on *Rightmire v. Hirner*, 188 Pa. 325, 41 A. 538 (1898), where the court held that "plaintiff was an active, pushing sales agent, who . . . could engage successfully in other business, [and therefore he] . . . was bound to do so when his contract with the defendants was at an end. . . . [T]he jury must take into consideration what the plaintiff probably could earn in some other employment or occupation during the period during which the contract ran." 188 Pa. at 329–330, 41 A. at 539. Defendant also cites *Buono Sales, Inc. v. Chrysler Motors Corp.*, 449 F.2d 715, 720–21 (3d Cir. 1971), which is to the same effect, although applying New Jersey law. The Marders maintain that Conwed's termination of the agency agreement did not put them in a position to seek other new business because Vail left the partnership at about the same time as Conwed terminated the Marders' government business.

Although the Marders may not have been in a position to seek any new business because Vail left at about the same time as Conwed terminated the Marders' government business, if Conwed had not terminated the Marders, they would have either had to hire a new person to handle the partition sales to the government, or they would have had to handle the business themselves. If the Marders had no duty to prove amounts of income earned from other

accounts because Conwed's cancellation did not leave them with any "idle capacity," to use plaintiffs' words, then they were obligated to prove what the cost would have been either in terms of their own time or in terms of hiring someone to replace Vail. Put another way, the Marders were obligated to prove how much they saved by no longer having Vail's expenses and by not having to pay him a share of the partnership profits. Either way the lack of proof is viewed, it is highly relevant to the question of the amount of the Marders' damages. Whether Vail was replaced, or the Marders took over the government account themselves, the cost of the replacement or of the Marders' time in selling the partitions was a business expense which the jury had to deduct from the gross commissions that would have been earned by the Marders to arrive at the Marders' lost profits. There was no evidence submitted as to the cost of replacing Vail or how much of the Marders' time would have been occupied with the government sales, and thus the jury was left with insufficient evidence to determine the Marders' damages.

The defendant raises one further argument related to its contention that there was insufficient evidence as to damages: Plaintiffs failed to prove that they were entitled to commissions from sales of the later model ("Series 800") dividers, even if there was sufficient evidence that they were entitled to be retained for a reasonable period as sales representatives for the earlier ("Series 900") dividers. Relying on the rule expressed in *Keystone Diesel Engine Co. v. Irwin*, 411 Pa. 222, 224–26, 191 A.2d 376 (1963), that in a suit for breach of contract, only those damages are recoverable (1) as would ordinarily follow from the breach and (2) which were within the reasonable contemplation of the parties, defendant argues that neither requirement is met because the evidence showed that the Series 800 partitions had not even been developed at the time the parties entered into the sales representative agreement. Even when the Series 900 partition went on schedule in 1971, the event which constitutes the extra consideration, the Series 800 did not exist, Conwed argues.

I reject the argument. The Series 800 partition was not a different product from the Series 900; the Series 800 and Series 900 were identical except that the former had a higher sound absorbency rating and was more fire retardant. Vail testified that the reason for placing the Series 800 on a separate schedule contract was to gain certain shipping cost advantages and to extend the time the dividers could remain on schedule overall. (N.T. at 206–07) As the Series 800 went into full production, sales of the Series 900 dropped off sharply. The Series 800 was nothing more than a somewhat improved version of the Series 900 partitions. The jury could well infer that the parties contemplated that there would be improvements in the newly developed partitions, and that if the Marders were entitled to sell and receive commissions from sales of the earlier model, they would also be entitled to act as sales representatives for the improved models. The evidence was adequate in this regard.

Plaintiffs seek refuge from their failure to submit sufficient evidence of damages in the following language from *Commonwealth Trust Co. v. Hachmeister Lind Co.*, 320 Pa. 233, 239, 181 A. 787, 790 (1935):

"'[A] defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible.'"

Plaintiffs fail to offer any instance, however, of wrongful conduct by Conwed making the ascertainment of damages more difficult. The only suggestion by plaintiffs is that the defendant had a full opportunity during cross-examination of plaintiffs' witnesses to bring out more detail as to plaintiffs' damages. For this proposition they rely on *Ashcraft v. C. G. Hussey & Co.*, 359 Pa. 129, 132–33, 58 A.2d 170 (1948). In *Ashcraft*, however, the issue was not the adequacy of the evidence of damages, but rather the accuracy. The amount of damages had been clearly stated. Defendant

disputed the accuracy of that amount. In the instant case, there was insufficient evidence to ascertain with reasonable certainty *any* figure for the plaintiffs' damages. The burden of submitting such evidence was clearly on the plaintiffs. *Rightmire v. Hirner*, 188 Pa. 325, 41 A. 538 (1898).

The significance of plaintiffs' failure to submit sufficient evidence as to the amount of expenses related to sale of the Conwed partitions in 1971, and to what expenses would have been in subsequent years, goes beyond the issue of proof of damages.

The plaintiffs, by failing to submit sufficient evidence as to their expenses in getting the partitions on schedule and developing a market for them, left the jury without any means of determining the extent of their investment, their "extra consideration," which entitled them to be retained as Conwed's sales representatives for a reasonable period. Without the jury knowing the amount of time, effort and money expended by the partnership in their missionary work with GSA and various agencies, there was no way it could reasonably determine what was a reasonable period for the Marders to be retained as Conwed's representatives. The related insufficiency of evidence as to what the Marders' expenses would have been as sales representatives for the partitions after 1971 further frustrated any effort by the jury to fix a reasonable period for the contract. Without knowing what their expenses would have been, the jury could not arrive at even an estimate of what the Marders' net profits would have been in each year the dividers were on schedule. So even if the jury had known the amount of the Marders' investment or extra consideration, and thus could determine what amount of future profits would give them a reasonable return on that investment, the jury had no means of determining what period of time as Conwed's representatives would give them that return in profits, and thus whether the Marders had, in fact, been prematurely terminated. The lack of evidence as to expenses left the jury, therefore, with insufficient facts in each of the two areas which had to be resolved before the jury could determine

what was a reasonable period for the representative agreement with Conwed to run. While there was sufficient evidence from which the jury could find that the Marders' employment contract with Conwed was intended by the parties to be for a reasonable period, there was insufficient evidence from which the jury could reach any conclusion as to what that period should be.

The plaintiffs' failure to present sufficient evidence as to (1) the damages they incurred and (2) what period of time they were entitled to be retained as Conwed's representatives would permit me to grant Conwed's motion for judgment n. o. v. *See* 5A Moore's Federal Practice ¶ 50.07[2]. The trial court may grant a new trial in place of judgment n. o. v., however, where "fairness dictates that the non-moving party be given another opportunity to make good his claim or defense." 6A Moore's Federal Practice ¶ 59.08[5]. *See* Discussion, *supra*. In the circumstances of this case— where the evidence of what plaintiffs' expenses were and what they would have been had they been retained may have been available for presentation to the jury—I believe that the proper exercise of my discretion would permit plaintiffs one more opportunity to prove their case. Thus I conclude that the insufficiency of evidence of damages entitles the defendant to the grant of a new trial.

IV. *Jury's Verdict was so Excessive as to Require a New Trial*

■ Conwed next argues that the jury's award of $113,304 was so grossly excessive that it is entitled to a new trial on that ground as well. *See* 6A Moore's Federal Practice ¶ 59.08[6]. Conwed's reasoning is that, assuming Conwed breached its employment contract with the Marders, the amount of damages due the Marders can be roughly approximated as their investment of time and money in preparing to make sales to the government, plus a fair return on that investment. The "most grandiose interpretation" of the Marders' investment, says Conwed, would be $20,000 for Vail's draw and expenses plus the total cost of

Hyman Marder's twenty or so missionary trips to Washington, D. C., and his other costs related to sales of the partitions to the government and getting them on schedule. Assuming a compensation to Hyman Marder of even $1,000 per day, Conwed calculates that the jury's award has in effect given the Marders a return of more than 200% on their investment.

The Marders respond that the jury simply determined a reasonable period for the Marders' employment to continue, calculated the gross income during this period, and deducted annual expenses of $20,000 plus the cost of a new one-third partner to the business.

The Marders' reasoning succeeds by assuming the conclusion; that is, that the Marders were entitled to be retained for such a period that their gross commissions ($250,000) less expenses would amount to the jury's verdict, $113,304. But as Conwed's argument demonstrates, the reasonable period must be based on the extent of the Marders' total investment, and even the most generous interpretation of the value of the Marders' investment cannot possibly lead to the conclusion that the return of that investment plus a reasonable return on the investment leads to a measure anywhere near the $113,304 awarded by the jury. I conclude, therefore, that the jury's verdict was grossly excessive, and defendant is entitled to a new trial on that ground.

## V. Jury's Verdict was an Illegal Quotient Verdict Requiring a New Trial

■ The court should grant a new trial where it appears by legally competent proof or deduction that the jury's verdict is a quotient verdict, that is, where the jurors returned a verdict arrived at by averaging each of their several estimates of damages. See 6A Moore's Federal Practice ¶ 59.08[4] n. 16. Conwed's Memorandum attempts to demonstrate through a detailed table of figures and lengthy computations made therefrom that the only way the jury could have arrived at the precise figure it did was through averaging a figure for damages arrived at by each juror. The Marders' Memorandum, in turn, relies on the previously described explanation of how the jury reached its verdict: Taking the gross commissions the Marders would have earned over a reasonable period of employment ($250,000), subtracting one third of the profits that would have gone to Vail's replacement ($83,333) and subtracting $20,000 annual expenses for the length of the reasonable period ($53,333).[4]

If there is anything about the result in the instant suit that is clearly determinable, it is that how the jury arrived at the amount of its verdict is absolutely indeterminable. The method suggested by Conwed is so complicated as to defy belief. The method of calculation presented in the Marders' Memorandum is illogical. The deduction of $83,333 for "one-third profits to Vail's replacement" is a deduction of one-third of the gross commissions, not one-third of the net profits as asserted by the plaintiffs. I am quite sure that the jury could have used any one of several methods to arrive at the figure it did, including taking total partition sales for some period, multiplying that figure by a commission rate of between 3 and 8 percent, and subtracting some amount of expenses that may or may not have been based on the testimony that Vail's draw and expenses were $20,000 for 1971.

In any case, no competent evidence has been submitted which would demonstrate that the jury's verdict was a quotient verdict. Defendant is not entitled to a new trial on that basis.

## VI. Error in the Admission of Testimony as to Conspiracy Requires a New Trial

■ A portion of Hyman Marder's deposition which I permitted to be read at trial

---

4. The final figure arrived at by the Marders is $133,334, while the actual verdict returned by the jury was $133,304. They explain the discrepancy as resulting from the Court's Deputy Clerk misunderstanding the jury foreman's oral pronouncement of the verdict. Reply to Defendant's Brief in Opposition to Mold the Verdict (Document No. 110) at 2.

contained suggestions by Hyman Marder that Conwed and Vail had an understanding that Vail would get the Conwed partition business after terminating his relationship with the Marders. (N.T. at 141–46) Conwed argues that because no other evidence of a conspiracy was offered by plaintiffs at trial, and I directed a verdict for defendant on plaintiffs' claim of common law conspiracy, the testimony of Hyman Marder on conspiracy was irrelevant. Moreover, the testimony was based on inadmissible hearsay. The admission of the testimony was, therefore, error under Federal Rules of Evidence 401 and 602, and its highly prejudicial effect requires that a new trial be granted.

Assuming that admission of the testimony was error, I conclude that the testimony was quite innocuous, and no new trial is required on the basis of that testimony. The suggestion of Hyman Marder that there was an understanding between Conwed and Vail was based on statements made by Vail to Hyman Marder. Even assuming that the jury believed that Vail had made these statements to Hyman Marder, which were repeated in the deposition, the jury was hardly likely to be persuaded that they indicated the presence of conspiracy between Vail and Conwed. The only testimony of Hyman Marder as to the "basis for your belief that Vail had some kind of an understanding with Conwed prior to the dissolution of the partnership . . . ." was that Conwed refused "to sit down and discuss the reasons for terminating us as representatives . . . . [Conwed] wouldn't accept the call [from us]." (N.T. at 144–45.) The strength and substance of the sum of this testimony was so small that it could not have been prejudicial to Conwed.

VII. *Errors in Instructions to the Jury Require the Grant of a New Trial*

Conwed's final argument in support of its motion for a new trial challenges certain instructions to the jury as erroneous. *See* 6A Moore's Federal Practice ¶ 59.08[2]. The first complained of instruction related to the effect of the dissolution Agreement entered into between Vail and the Marders. My instruction to the jury was:

"The partnership dissolution agreement, which is P–8, and will be before you, prohibited Vail from soliciting Marder-Vail commercial accounts for 90 days, but contained no similar prohibition against solicitation of the government accounts. From this, Conwed concluded that there was no impediment to its dealing with Vail for government business.

"Now members of the jury, let me put that dissolution agreement in its proper perspective. Even though the dissolution agreement contains no restrictions on Vail's right to solicit government business, that does not relieve Conwed from any contract which you find that it had with the Marders. That dissolution agreement did not assign any of the Marders' rights in their contract with Conwed for government business. If you were to find, therefore—and I am using this as an example only—if you were to find that the Marders and Conwed intended that the contract was to run for a reasonable time, and if you were to find that a reasonable time under the circumstances extended beyond January 23, 1972 at which point the business was assigned to Vail, then Conwed would be in violation of this agreement with the Marders, and the Marders would be entitled to recover damages for the period during which you find they should have remained Conwed's representative for government business.

"The only effect of the lack of restriction of Vail's right to solicit government business would be that it would protect Vail from any claim for damages by the Marders."

(N.T. 474–75.)

Conwed maintains that the effect of the instruction was to remove from the jury's consideration the dissolution agreement as relevant to the intent of the parties as to what period they intended the Marders would be retained as Conwed's manufacturers' representative to the government.

Second, says Conwed, the instruction removed the dissolution agreement from the jury's consideration as the basis for defendant's argument that the Marders' failure to inform Conwed that the dissolution agreement did not apply to Conwed's business estopped the Marders from asserting that they were entitled to be retained as Conwed's representatives to the government after Vail left the partnership.

■■■ The Marders contend that Conwed failed to object to the instruction, and thus have not preserved their right to raise any error in the instruction as grounds for a new trial. They also argue that the instruction took nothing away from the jury's consideration. As to Conwed's argument that the instruction removed Conwed's estoppel theory from the jury, the Marders submit that estoppel is an affirmative defense that must be pleaded, and since the Marders failed to plead estoppel, they were not entitled to have the jury instructed on the theory.

Federal Rule of Civil Procedure 51 provides in part:

"Instructions to Jury: Objection. . . . No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

Thus failure to object to an improper instruction and to state the grounds for the objection normally waives any error in the instruction. Where an error in instructions to the jury may have caused a miscarriage of justice, however, the court's error in instructing the jury may be the basis for granting a new trial even though no timely or proper objection was made to the instructions. 6A Moore's Federal Practice ¶ 59.02[2] at 59–106. Generally errors in instructions will be reviewed where no objection was made only if the error was fundamental or was likely to have been decisive in the jury's verdict. See Choy v. Bouchelle, 436 F.2d 319 (3d Cir. 1970); Cowen v. Fulton, 407 F.2d 93 (4th Cir. 1969); 5A Moore's Federal Practice ¶ 51.04 n. 4. See

also Morley v. Branca, 456 F.2d 1252 (3d Cir. 1972); Kolman v. Jacoby, 419 F.2d 395 (3d Cir. 1969).

■■■ Conwed argues that it did specifically object to the Court's failure to properly charge on the effect of the dissolution agreement, citing the trial transcript at page 485. The only objection at that page, however, is the following:

"Mr. Farmer [Conwed's counsel]: I would object to the failure to instruct the jury that if they find that the dissolution changed the nature of the parties that gave Conwed a right to terminate regardless of whether or not a reasonable termination extended further."

That objection is a distinctly different objection from the one Conwed now seeks to make. In fact, the objection made at trial is the very same objection Conwed asserts as the second erroneous instruction to the jury. See Discussion infra. No objection to the above quoted instruction was made at the time of trial, and any erroneous inference contained in the instruction was not, in my view, so prejudicial that its effect would have been decisive on the jury's verdict. Conwed is not, therefore, entitled to a new trial on the basis of any error in the instruction relating to the effect of the dissolution agreement.

■■■ The second alleged error in the instructions to the jury related to that portion of the charge covering Conwed's defense that the Marders were incapable of performing their obligations as Conwed's manufacturers' representative to the government. (N.T. at 482–83.) Conwed, quoting two excerpts from that portion of the instructions, argues that their effect was to remove from the jury's consideration the question of whether Conwed contemplated that its sales representative contract with Marder-Vail Associates was "delegable" to the Marders after the Marder-Vail partnership dissolved; the rule is that the dissolution of a partnership acting as agent ordinarily terminates the agency even though some of the old members create a new partnership. See Knudsen v. Torrington Co., 254 F.2d 283, 286 (2d Cir. 1958); 2A C.J.S. Agency § 140.

An examination of that section of the charge demonstrates that it did remove from the jury's consideration the issue of whether Vail's withdrawal from the partnership, in and of itself, gave Conwed the right to terminate the Marders as manufacturers' representatives. My instruction was:

"Conwed argues that when Marder-Vail Associates dissolved their partnership, that rendered the Marders incapable of performing the sales representation agreement in accordance with the understanding of the parties. But you will bear in mind, members of the jury, that in that regard you have to consider whether Conwed gave the Marders the opportunity, either to do themselves the work necessary to solicit and service the government accounts, or to take in some third person to substitute for Vail. Conwed did act unilaterally in terminating the Marders without affording them the opportunity to make other arrangements for the proper handling of the government accounts after Conwed was notified of the dissolution of Marder-Vail Associates."

(N.T. at 482–83.)

The statements that the jury was to consider whether Conwed gave the Marders the opportunity to perform after Vail left, and that they in fact did not give the Marders such an opportunity, strongly suggests that Conwed was obligated to do so. The effect of this instruction would have been to leave the jurors with the impression that they could not consider that Conwed may have had the right to terminate the Marders at the time the agent—the partnership—substantially changed. This was error which, standing alone, probably would not have warranted the grant of a new trial, but in combination with the other deficiencies in the trial, affords additional basis for the grant of a new trial.

The final error in the instructions which Conwed raises as the basis for a new trial is the refusal to charge as to a possible defense of Conwed's that the prospective poor performance of the Marders subsequent to the dissolution of Marder-Vail Associates justified the termination of the Marders' representation for the government business.

In refusing the requested points for charge, I stated:

"I am not aware of any evidence to support those points . . . .. There is no evidence to the effect that the defendant gave Marders an opportunity to handle the government business themselves; maybe by giving up other work or by obtaining someone to replace Vail."

(N.T. at 415.)

Conwed contends that an agent may be properly terminated if the principal reasonably anticipates that the agent will be incapable of performing, and that the principal is not required to actually give the agent the opportunity to perform if it is apparent that the agent will not be able to perform when performance is due. Therefore, argues Conwed, the refusal to charge as to poor performance because Conwed had not actually given the Marders the opportunity of performing was error.

Although my statement of the reasons for rejecting these requested points of charge may not have been entirely clear, it was then, and is now, clear in my mind that the primary reason for rejecting them was that there was insufficient evidence that the Marders' alleged poor performance—actual or prospective—was Conwed's reason for terminating the Marders. Brief mention of the Marders' poor performance was made twice at trial, and in both instances the evaluation was greatly qualified. *See* Deposition of James Foster at 17–18; N.T. at 380–85. In addition, at the time of termination, Conwed said nothing to intimate, directly or indirectly, that the termination was for poor performance, past or future. Under the circumstances, Conwed was not entitled to have the jury instructed on the defense of poor performance.

VIII. *Remittitur*

Having concluded that the defendant is entitled to the grant of a new trial, there remains the question of remittitur.

Conwed has not moved for an order of remittitur, however I may enter an order of remittitur on my own motion. 6A Moore's Federal Practice ¶ 59.05[3] at 59–47 n. 1. Entry of an order to remit conditions the grant of a new trial upon the failure of plaintiffs to remit the amount of the jury verdict deemed excessive. *Id.* at 59–54. The remittitur device was adopted to correct the injustice of an excessive verdict while enabling the court and the parties to avoid the delay and expense of a new trial, "and when wisely used furthers the legitimate objective of bringing litigation to as speedy and expeditious end as is reasonable." *Id.* at 59–48. *See also Glazer v. Glazer*, 278 F.Supp. 476, 482 (E.D.La.1968). If the plaintiffs decline to accept the remitted verdict, then the new trial order is effective. If plaintiffs accept the remittitur, then judgment will be entered in that amount; defendant's only recourse then is to appeal, as it would any other final judgment. *Holmes v. Wack*, 464 F.2d at 86, 89 (10th Cir. 1972).

At the outset of the discussion on remittitur, I concede that any figure offered as a measure of damages is an approximation at best; the crucial failure in plaintiffs' case was the lack of evidence from which the amount of damages could be accurately determined. Some rough approximation of the damages plaintiffs incurred as the result of Conwed's premature termination of the Marders' representation may, nevertheless, be reached by taking, first, the $20,000 testified to as Vail's "draw and expenses," some portion of which may serve as some measure of the Marders' expenses, and, second, by taking Hyman Marder's 20 or so visits to Washington, some portion of which may properly be characterized as the Marders' additional investment in the contract for space divider sales to the government. Using this evidence to approximate the Marders' investment of time and money, and adding to it some increment for return on their investment, an award of $35,000 is within the realm of reason. If within ten days plaintiffs remit all amounts awarded above $35,000, I will deny defendant's motion for new trial. Upon failure of filing of such remittitur defendant's motion for a new trial will be granted.